1
2
3
4
5
6
7
8                        IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RUFUS HARTY KELSAW, IV,

11              Petitioner,                    No. CIV S-08-1612 MCE CHS P

12        vs.

13   BOB HOREL,

14              Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                              I.  INTRODUCTION

17              Petitioner Kelsaw is a state prisoner proceeding pro se with a petition for writ of

18   habeas corpus brought pursuant to 28 U.S.C. §2254.  Kelsaw stands convicted of kidnaping and

19   first degree murder in the Sacramento County Superior Court.  He is currently serving a sentence

20   of life in prison without the possibility of parole.  In the pending petition, Kelsaw challenges the

21   constitutionality of these convictions through several different grounds for relief.

22                              II.  BACKGROUND

23              Kelsaw and his cousin by marriage, Terah Lawyer were charged by information

24   with one count of kidnaping and one count of murder accompanied with the special

25   circumstances of lying-in-wait and kidnaping.  It was additionally charged that a principal was

26   armed with a firearm.

                                        1

Lawyer was tried separately before Kelsaw's trial.  A jury found her guilty of one count of kidnaping and one count of first degree murder with a kidnaping special circumstance. Lawyer's jury found the lying-in-wait special circumstance not true.  On the kidnaping count, it found that a principal had been armed with a firearm.  In exchange for sentencing considerations, Lawyer entered into an agreement with the prosecutor to testify at Kelsaw's trial.  After Lawyer testified at Kelsaw's trial, her conviction was reduced to second degree murder and she was sentenced to a term of 16 years to life.  Subsequently, at Kelsaw's trial, Lawyer gave testimony establishing as follows:

In April 2002, [Kelsaw]'s cousin by marriage, Terah Lawyer, was 18 years old. [Kelsaw] sold CDs which he burned himself. At times, Lawyer accompanied [Kelsaw] as he sold CDs, mostly at shopping centers.

At about 6:00 p.m. on April 15, 2002, Lawyer called [Kelsaw] on his cell phone. They agreed to meet at a Wal-Mart parking lot where he was selling CDs. Lawyer left the parking lot with [Kelsaw], and [Kelsaw] asked her to do him a favor. [Kelsaw], referring to the victim, Mi'angelo Cordero, told Lawyer there was someone who wanted to take [Kelsaw]'s chain, a large platinum chain with diamonds and a medallion. [Kelsaw] wanted to "confront and check" (Lawyer's words) Cordero and needed to get Cordero away from his fellow gang members. [Kelsaw] said he wanted Lawyer to bring Cordero to a gas station. They drove together in [Kelsaw]'s car to Mack Road, and [Kelsaw] pointed out Cordero, who was sitting on some stairs talking to several other males. Just a few minutes later, Lawyer returned to Mack Road in her own car. She approached Cordero and feigned interest in renting an apartment. Eventually, she asked Cordero if he wanted to go to the movies with her that night. He said he did, and they exchanged telephone numbers.

Lawyer returned to the Wal-Mart parking lot where [Kelsaw] was waiting and reported her contact with Cordero. Within a short time, Cordero called Lawyer's cell phone, and Lawyer, not knowing what to say, asked Cordero to call her back in an hour. [Kelsaw] and Lawyer went to Lawyer's apartment, and [Kelsaw] told Lawyer there was a change in plans. [Kelsaw] wanted Lawyer to pick up Cordero and take him to a motel room. They drove to a Motel 6 near Mack Road, and [Kelsaw] gave Lawyer a card key for room 161. He told Lawyer that he and his friends would be inside the room, in the bathroom. He instructed Lawyer to have Cordero come in the room and lead him to believe they would have sex.

Once Cordero's shirt was off, [Kelsaw] would come out of the bathroom and confront Cordero.

Lawyer called Cordero and told him she was ready to come pick him up. Lawyer went to the parking lot of a liquor store across from the apartments where she had met Cordero. Cordero approached the car, and Lawyer told him they were going to a motel room to "have a good time." She asked Cordero to buy a box of condoms. He went into the liquor store and came out with a box of condoms. Lawyer told him not to bring a gun. With Cordero in the car, Lawyer drove back to the motel.

Lawyer and Cordero entered the motel room.  Cordero sat down on the bed, and Lawyer told him to take his shirt off. [Kelsaw] and several others came out of the bathroom and confronted Cordero. [Kelsaw] hit Cordero in the face and then the others joined in, hitting and kicking Cordro. [Kelsaw] hit Cordero with the handle of a gun.  Lawyer backed into a corner as she watched, and Cordero eventually fell to the floor unconscious.  When he regained consciousness, the men sat Cordero up in a char and [Kelsaw] flaunted his chain. [Kelsaw] held a gun to Cordero's head and said he could kill Cordero.  Cordero was bleeding from his nose and arm and his eye was swollen.  The men threw Cordero, handcuffed, into the bathtub.

[Kelsaw] told Lawyer they were going to drop Cordero off "in the boondocks." Lawyer and the men all left the motel room and got into two cars. Cordero, still handcuffed, was placed in a rental car with the other men. [Kelsaw] told Lawyer to follow in his Dodge Neon. On the freeway, [Kelsaw] called Lawyer and told her to go wait at his apartment, but Lawyer continued to follow. The group took the Cal Expo exit and went to the parking lot of a Costco.

All of the men, except for one who stayed behind in the car, took Cordero out of Lawyer's sight. Lawyer called a friend and, while on the phone, she heard two gunshots. [Kelsaw] came running back to the cars, along with two other men. They got into the cars and left, [Kelsaw] riding in the Dodge Neon, which Lawyer was driving. [Kelsaw] told Lawyer they shot Cordero in the head. Lawyer noticed blood on [Kelsaw's] shoes and "human matter" on his pants.

[Kelsaw] told Lawyer to return to the motel room and clean it up. She and another woman went to the motel room and used bleach to clean blood off the walls.

(*People v. Kelsaw*, No. C047832, slip op. at 3-6 (Cal. App. 3 Dist. 2007)).

/////

3

1    Other evidence was admitted at trial as follows:

2    Cordero's body was found in the Costco parking lot, in the mud, at
about 7:00 a.m. on April 16, 2002. He had been shot twice in the
3    head. The wounds were both contact wounds. He was shot at a 60
degree downward angle. Shoe prints were found in the mud. A
4    condom box was nearby in a planter. It was empty and had no lid.
Cordero's and Lawyer's fingerprints were on the box.
5
Four months after the murder, investigators examined the Motel 6
6    room. They collected blood from the wall that matched Cordero's
blood. They also concluded that carpet fibers found in Cordero's
7    socks matched the carpet in the room. Motel records showed that
[Kelsaw] rented the room on April 15, 2002.
8
Kweanna Smith testified that [Kelsaw] told her he killed Cordero
9    because Cordero wanted to take his chain. He had a girl lure
Cordero to the motel room where [Kelsaw] and others beat him up
10   and burned him with cigarettes. They then took Cordero to the
Costco parking lot and, while Cordero was on his knees, [Kelsaw]
11   shot him in the back of the head. Smith was [Kelsaw]'s former
girlfriend, but Smith's boyfriend at the time of trial was Cordero's
12   best friend. She wanted to help Cordero's family by testifying
against [Kelsaw].
13
[Kelsaw] presented evidence that his girlfriend, Latoya Horne,
14   dropped him off at the Jack in the Box on Mack Road at about
10:00 p .m. on the evening of April 15, 2002. The next morning, at
15   about 10:00 a.m., [Kelsaw] called her from Oakland. She went to
Oakland and picked him up at around 11:30 a.m. After his arrest,
16   [Kelsaw]  told Horne he had rented a room at the Motel 6 for
Lawyer on the evening of April 15, 2002, but then he spent the
17   night with another woman at a motel in Oakland.

18   (*People v. Kelsaw*, No. C047832, slip op. at 6-7.)

19       Kelsaw was convicted by jury of first degree murder during which a principal was

20   armed with a firearm.  The jury found not true the allegations that he personally used a firearm or

21   discharged a firearm.  On the murder count, the jury found the kidnaping special circumstance

22   true but found the lying-in-wait special circumstance not true.  The jury also convicted Kelsaw of

23   kidnaping, and with respect to this count, found true the allegation that a principal was armed

24   with a firearm but found not true the allegations that he personally used a firearm or discharged a

25   firearm.

26   /////

4

At sentencing, the trial court imposed the upper term for the kidnaping count but stayed that term as well as the firearm enhancement associated with that count. Kelsaw was sentenced to life without the possibility of parole for the special circumstance murder, plus one year for the firearm enhancement on that count.

Kelsaw appealed his convictions on various grounds to the California Court of Appeal, Third District. Except for the striking of a parole revocation fine, the state appellate court affirmed the judgment against him. The California Supreme Court denied review.

Kelsaw presented several additional grounds for relief in a habeas corpus petition to the Sacramento County Superior Court; the petition was denied. The California Court of Appeal, Third District, and the California Supreme Court likewise denied Kelsaw's claims on state habeas corpus review.

### III. ISSUES FOR REVIEW

The pending petition consists of more than 150 typed pages, exclusive of its many exhibits. Kelsaw sets forth 19 distinct grounds for relief in two separate groups; the first group is numbered 1-10; the second group is numbered 1-9. For purposes of this opinion, Kelsaw's grounds designated 1-9 in the petition will be renumbered and referred to herein as grounds 10-18. Many of Kelsaw's grounds for relief are related or based on common sets of facts, while others appear to either present more than one constitutional issue or overlap with other grounds with respect to the constitutional issue presented. For purposes of this opinion, Kelsaw's claims will be analyzed as follows.

Subsection (A) will examine Kelsaw's claims relating to Lawyer's sentencing agreement. Kelsaw contends in three separate but related grounds (petition grounds 1, 2, and 12) that his conviction must be reversed because his trial counsel rendered ineffective assistance in failing to object to or move to exclude Lawyer's testimony at trial. Kelsaw further claims that appellate counsel rendered ineffective assistance in failing to claim on appeal that Lawyer's sentence was improperly reduced to second degree murder (petition ground 10). Subsection (B)

1    will review Kelsaw's contentions that a mis-statement of the law by the prosecutor during

2    closing argument constituted prejudicial misconduct (petition ground 3), and, alternatively, that

3    trial counsel provided ineffective assistance of counsel for failing to object to the prosecutor's

4    comment (also petition ground 3).  Subsection (C) will examine Kelsaw's various grounds for

5    relief which are based on allegations of possible jury misconduct.  These grounds include alleged

6    trial court error (petition ground 7) and ineffective assistance of appellate counsel (petition

7    grounds 16 and 19).  Subsection (D) will review Kelsaw's additional allegations of trial court

8    error: specifically that the trial court erred in admitting prejudicial rap lyrics into evidence

9    (petition ground 6), his alternate claim that trial counsel rendered ineffective assistance to the

10   extent he failed to make the "proper objections" (also petition ground 6), and finally, his

11   contention that the trial court erred in excluding gang evidence relevant to motive (petition

12   ground 5).  In subsection (E), Kelsaw's remaining allegations of ineffective assistance of trial and

13   appellate counsel will be set forth and discussed (petition grounds 4, 11-13, 17-18).  Finally, in

14   subsection (F), Kelsaw's claims of instructional error by the trial court (petition grounds 8 and 9)

15   will be reviewed.

16              IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

17              An application for writ of habeas corpus by a person in custody under judgment of

18   a state court can be granted only for violations of the Constitution or laws of the United States.

19   28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

20   *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

21   This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

22   the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

23   U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

24   AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

25   state court proceedings unless the state court's adjudication of the claim:

26   /////

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

## V.  DISCUSSION

A.      Lawyer's Sentencing Agreement and Testimony

1.      Ineffective Assistance by Trial Counsel in relation to the Sentencing Agreement

In three separate but related grounds, Kelsaw claims that his trial attorney, Jon P. Lippsmeyer, rendered ineffective assistance in failing to object to or move to exclude Lawyer's testimony on the basis of prosecutorial misconduct (petition ground 1), judicial misconduct (petition ground 15), and because her testimony was "coerced" by the terms of the sentencing agreement she entered into with the prosecutor in her separate criminal case (petition ground 2). Kelsaw additionally claims that appellate counsel rendered ineffective assistance in failing to raise on appeal, except by reply brief which forfeited the claim, the contention that Lawyer's conviction was unlawfully reduced from first degree murder to second degree murder in her separate criminal case (petition ground 10).

As recounted earlier, Lawyer was found guilty of kidnaping and first degree murder in a separate trial which concluded, except for sentencing, before Kelsaw's trial began. As to the murder count, Lawyer's jury found true the special circumstance of kidnaping.  Lawyer then entered into a sentencing agreement with the prosecutor.  Additional background facts relative to these grounds were set forth on direct appeal by the California Court of Appeal as follows:

/////

Before Lawyer's sentencing, the prosecutor filed a document in the trial court stating that Lawyer had agreed to talk to the prosecutor about possible cooperation against others involved in the crimes and that the prosecutor would not use any information obtained from Lawyer during this interview in any criminal case against her. Lawyer spoke with the prosecutor, and they signed an agreement on January 14, 2004, that, in exchange for her testimony against [Kelsaw], Lawyer would "be sentenced ... to a stipulated term of 15 years to life for violation of [Penal Code section 187, subdivision (a) (murder) ] and 1 year consecutive for violation of [Penal Code section 12022, subdivision (a)(1) (firearm enhancement) ]." The agreement also provided that Lawyer would plead guilty to an unrelated embezzlement charge and receive a concurrent sentence. Concerning her testimony against [Kelsaw], the agreement required Lawyer to "testify truthfully and completely" and "any deviation from the truth" would render the agreement "null and void."

Before agreeing with the prosecutor, Lawyer moved to strike the special circumstance. The court, Judge Patrick Marlette presiding, denied the motion. Lawyer agreed with the prosecutor to testify and testified for the prosecution at [Kelsaw]'s trial, with Judge Michael Garcia presiding. After [Kelsaw]'s trial, Judge Marlette struck the special circumstance and modified Lawyer's conviction from first degree murder to second degree murder. He then imposed the stipulated term of 16 years to life.

(*People v. Kelsaw*, No. C047832, slip op. at 7-8.)

Kelsaw contends, first, that trial counsel should have moved to exclude Lawyer's testimony on the ground it was procured by prosecutorial misconduct, in that the prosecutor promised Lawyer a sentence reduction that violated California law and resulted in imposition of an unlawful sentence by the court. To the extent Kelsaw bases his claim that trial counsel failed to object to Lawyer's testimony on such alleged "prosecutorial misconduct," the California Court of Appeal, Third District, held as follows on direct appeal:

[T]rial counsel's performance was not deficient. (*People v. Lewis* (2006) 39 Cal.4th 970, 988-989 [claim of ineffective assistance of counsel requires deficient performance].)

[Kelsaw] asserts the prosecutor unlawfully induced the trial court in Lawyer's case to strike the special circumstance. Penal Code section 1385.1 states: "Notwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or nolo

8

contendere or is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive." While the minutes of Lawyer's sentencing reflect that the trial court struck the special circumstance finding, it was immaterial whether the finding was stricken because the trial court also reduced the crime to second degree murder. Because a special circumstance finding has no sentencing effect on a second degree murder conviction, it was unnecessary and ineffectual to strike the special circumstance finding. The sentence was a lawful second degree murder term.

In his reply brief on appeal, [Kelsaw] contends it was also improper for the court in Lawyer's case to reduce the crime to second degree murder. We need not consider assertions made for the first time in the reply brief. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894-895, fn. 10 [points raised for first time in reply brief not considered unless good reason shown for failure to present them earlier].)

We also note that the prosecutor did not agree with Lawyer that the special circumstance finding would be stricken. Instead, the prosecutor agreed to a stipulated term. It was the trial court that struck the special circumstance finding, an action unnecessary to the sentencing agreement.

[Kelsaw] asserts the prosecutor's agreement with Lawyer "orchestrated a violation of the law" which "infected [Kelsaw]'s trial with such unfairness as to make his conviction a denial of Due Process...." As noted, [Kelsaw] has shown no violation of law. Therefore, even if we assume for the purpose of argument that a sentencing agreement between a witness and the prosecution could violate [Kelsaw]'s due process rights, [Kelsaw] has failed to show prosecutorial misconduct. And [Kelsaw]'s trial counsel was not deficient for failing to object to Lawyer's testimony based on prosecutorial misconduct.

(*People v. Kelsaw*, No. C047832, slip op. at 8-10.)

Kelsaw further alleges that counsel should have objected to Lawyer's testimony on the basis of "judicial misconduct" or trial court error.  Kelsaw presented this aspect of his ineffective assistance of counsel claim to the Sacramento County Superior Court on state habeas corpus review, where it was likewise rejected:

Petitioner claims that trial counsel should have objected to the sentencing agreement for witness Terah Lawyer, who was also Petitioner's co-defendant, as trial court error... Petitioner argues that his trial counsel failed to object because it was a losing argument.  Petitioner has not shown that the sentencing agreement

was improper.  The Court of Appeal's opinion noted that agreements to grant immunity or sentencing consideration in exchange for testimony do not violate a defendant's right to a fair trial.  In addition, Petitioner has not shown that the trial court erred when it found that life imprisonment without the possibility of parole [ ] was cruel and unusual punishment, given her background and her cooperation in testifying at Petitioner's trial.  Moreover, at the time of Lawyer's sentencing, on September 24, 2004, Petitioner had already been convicted and sentenced.  There was no reason why counsel could have objected to the sentencing of a co-defendant.

(*In re Kelsaw*, No. 07F08740, slip op. at 3 (Sup. Ct. Sacramento County, CA October 11, 2007).

Finally, in one additional related ground that was presented to the state courts on direct appeal, Kelsaw contends that trial counsel should have objected to Lawyer's testimony on the basis that it was "inherently coerced" by the terms of her sentencing agreement.  With respect to this contention, the California Court of Appeal held as follows:

[C]ounsel was not deficient because the trial court would have properly denied any such objection.

The Supreme Court recently reviewed the law, starting with *People v. Medina* (1974) 41 Cal.App.3d 438, concerning the claim that a witness's testimony was coerced: "In *Medina,* the Court of Appeal held that 'a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion.' ([ *Id.*] at p. 455.) We have since observed that when an 'accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police [citation], or that his testimony result in the defendant's conviction [citation], the accomplice's testimony is "tainted beyond redemption" [citation] and its admission denies the defendant a fair trial.' (*People v. Allen* (1986) 42 Cal.3d 1222, 1251-1252.) But 'an agreement requiring only that the witness testify fully and truthfully is valid.' (*Id.* at p. 1252.)" (*People v. Avila* (2006) 38 Cal.4th 491, 594.)

The sentencing agreement between the prosecutor and Lawyer included the following paragraph: "It is understood by all parties to this Agreement that Terah Lawyer met with detectives of the Sacramento Police Department in a recorded interview on August 7, 2002, and with representatives of the Sacramento District Attorney's Office in a recorded interview on November 7, 2003, which pertain to her knowledge of the events surrounding the murder of Mi'angelo Cordero occurring between April 15th and

10

16th, 2002. It is understood by all parties to this Agreement that except where clarified in these recorded interviews, Terah Lawyer's representations during those interviews are true and this Agreement is conditioned upon the truth of those representations[.]"

During her testimony in [Kelsaw]'s trial, Lawyer recounted her statements made on August 7, 2002, to a detective investigating Cordero's murder-the first interview to which the sentencing agreement referred. Lawyer was arrested on that day. While in custody, she claimed she did not know Cordero and was not familiar with the area where they met. At trial, she testified that those were lies she told because she "didn't want anything to do with it." Eventually, she told the detective she knew Cordero and that she dropped him off at the Motel 6. Lawyer told the detective no one else was involved, but later she said a person named Trent had asked her to bring Cordero to the Motel 6. In her trial testimony, Lawyer stated that Trent was "a concocted person [she] made up" because she did not want to reveal [Kelsaw]'s identity. Finally, still in the same August 7 interview, Lawyer, because of "the pressure ... of [her] conscience," told the detective it was [Kelsaw] who asked her to bring Cordero to the Motel 6. She claimed she did not know that [Kelsaw] had a problem with Cordero but later stated she knew [Kelsaw] was angry with Cordero. She also told the detective she neither went to the Costco parking lot nor cleaned up the Motel 6 room, even though she later testified that she did both.

Lawyer testified concerning her understanding of the deal she made with the prosecutor. She was scheduled to be sentenced to life without the possibility of parole. The prosecutor met with her and offered her a sentence of 15 years to life and immunity in exchange for her testimony in [Kelsaw]'s trial. Lawyer understood that a condition of the agreement was that she tell the truth and that the judge would ultimately determine whether she told the truth. If she did not testify truthfully, she would be sentenced to life without the possibility of parole.

On cross-examination, Lawyer said it was her understanding that the judge would determine the truth of her trial testimony by comparing it to the statement she gave to the district attorney on November 7, 2003, after her conviction. If her trial testimony against [Kelsaw] varied from the statement made to the district attorney, she would not get the reduced sentence. She also stated she had an obligation, in general, to tell the truth. Defense counsel questioned Lawyer about the possibility that she had made a mistake or lied during the interview with the district attorney and asked how she would testify if that were the case. She replied: "Well, the truth isn't hard to forget as far as, I mean my lies are something that I forgot. I couldn't even recall my lies, but the truth I'm quite certain about."

Although there is some language in the sentencing agreement labeling as "the truth" the statements Lawyer made to officers and the prosecutor, and Lawyer's understanding was that the judge would compare her testimony to her statements in determining whether she had told the truth, the agreement did not violate [Kelsaw]'s due process right to a fair trial. In *People v. Boyer* (2006) 38 Cal .4th 412, the witness was granted immunity in exchange for her truthful testimony. The immunity agreement stated that "'the witness represented that the testimony of the witness will be *truthful and* in substance as follows....'" (*Id.* at p. 457.) The court concluded this was not impermissibly coercive because it "simply reflected the parties' mutual understanding that the information the witness had previously supplied to the police was truthful, not that the witness had to iterate her prior statements, regardless of their truth." (*Ibid.*)

Here, as in *People v. Boyer,* Lawyer believed she was obligated to testify in conformity with her statements to officers and the prosecutor because those statements were the truth. She understood that she was "supposed to tell the truth." While she recognized her truthfulness would be measured by whether her testimony was consistent with her statement to the prosecutor, she was adamant that she told the truth in that interview: "I told the truth about the embezzlement, and I basically told the truth, and [the prosecutor] then, I guess, considered an agreement where as I would come and testify in this trial and receive a reduced sentence."

The sentencing agreement states that Lawyer gave two statements and the agreement is based on the truth of those statements. That did not necessarily mean, however, that Lawyer's testimony could only include what was in her prior statements. Indeed, as noted above, Lawyer's statement to officers on August 7, 2002, contained several different versions of what happened, and they were inconsistent. It is more likely the language conditioning the agreement on the truth of her prior statements was included because that is what induced the prosecutor to enter into the agreement. The later language in the sentencing agreement, in which Lawyer agreed "to testify truthfully and completely as a witness," made it clear that both parties contemplated that Lawyer would tell only the truth at trial. The bargain was not expressly contingent on Lawyer sticking with a particular version. (*People v. Boyer, supra,* 38 Cal.4th at p. 456.)

We also conclude that it makes no difference in this analysis that Lawyer had been convicted and would have been sentenced to life without possibility of parole if she had not made the agreement with the prosecutor to testify. As noted by the courts that have considered various agreements to grant immunity or sentencing considerations in exchange for testimony, these agreements, while exercising some compulsion, do not rise to the level of coercion that violates a defendant's fair trial rights. (See, e.g., *People v.*

12

1  *Fields* (1983) 35 Cal.3d 329, 361.) Accordingly, Lawyer's
   testimony was not coerced and [Kelsaw]'s due process right to a
2  fair trial was not violated.

3  (*People v. Kelsaw*, No. C047832, slip op. at 10-15.)

4         Thus, each of Kelsaw's three ineffective assistance of counsel claims premised on

5  trial counsel's failure to object to Lawyer's testimony in light of her sentencing agreement was

6  rejected on its merits by a state court in a reasoned decision.  Because each last reasoned state

7  court opinion is not an unreasonable application of clearly established Supreme Court precedent

8  nor an unreasonable determination of the facts, Kelsaw is not entitled to relief.

9         The Sixth Amendment guarantees a criminal defendant the effective assistance of

10 counsel.  A showing of ineffective assistance of counsel has two components.  First, a petitioner

11 must show that, considering all the circumstances, counsel's performance fell below an objective

12 standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  In

13 assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that

14 counsel's performance falls within the 'wide range of professional assistance,'" *Kimmelman v.*

15 *Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689), and that counsel

16 "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*,

17 898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

18        The second factor required for a showing of ineffective assistance of counsel is

19 actual prejudice caused by the deficient performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice

20 is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

21 result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is "a

22 probability sufficient to undermine confidence in the outcome."  *Id*.; *see also Williams*, 529 U.S.

23 at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

24        Here, Kelsaw fails to demonstrate that trial counsel's performance was deficient.

25 In other words, it does not appear that an objection to Lawyer's testimony based on any of the

26 three grounds advanced here would have been successful.

1        As an initial matter, it should be noted that the trial court properly instructed the

2  jury that Lawyer was an accomplice as a matter of law, that an accomplice's testimony must be

3  independently corroborated by some other evidence, and that an accomplice's testimony must be

4  viewed with caution and "in light of all the evidence in the case."  (RT at 2842; (*see also*

5  subsection (B), *infra*.)

6        Kelsaw's claims that trial counsel should have objected on the basis of

7  prosecutorial misconduct and/or trial court error are premised on his assertion that California law

8  prohibited the trial court from striking the kidnaping special circumstance to Lawyer's murder

9  conviction.  On direct appeal, however, the California court of appeal expressly concluded that

10  Lawyer's sentence was "a lawful second degree murder term."  In particular, the state appellate

11  court held that once the trial court reduced her murder conviction to second degree murder, the

12  special circumstance was immaterial because a special circumstance finding has no sentencing

13  effect on a second degree murder conviction under California law.  The state court's conclusion

14  in this regard is binding here.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("state court's

15  interpretation of state law, including one announced on direct appeal of the challenged

16  conviction, binds a federal court sitting in habeas corpus").

17        Kelsaw additionally contends that it was unlawful for the trial court to reduce

18  Lawyer's conviction to second degree murder.  The state court declined to review this particular

19  allegation, finding it had been improperly raised for the first time in a reply brief.  Due to the

20  timing of the events, however, the trial court's actions at Lawyer's sentencing could not have

21  provided a valid basis for Kelsaw's trial counsel to object to Lawyer's testimony at Kelsaw's trial

22  in any event.

23        Lawyer's testimony at Kelsaw's trial commenced on March 15, 2004 and

24  concluded on March 17, 2004.  This was *prior* to her own sentencing on September 24, 2004, the

25  date on which the trial court reduced her murder conviction to murder in the second degree,

26  struck the kidnaping special circumstance to the murder, and imposed the stipulated sentence of

1   16 years to life.  Thus, trial counsel had no occasion to object to Lawyer's testimony based on the

2   reduction of her conviction and the striking of the special circumstance in her criminal case.  At

3   the time of Lawyer's testimony, those events had not yet occurred.

4          Of course, Lawyer's sentencing agreement was in place at the time of her

5   testimony at Kelsaw's trial.  But it does not appear that the terms of the sentencing agreement

6   provided a valid basis for trial counsel to object.  As the state superior court noted, the terms of

7   Lawyer's sentencing agreement did not provide for the striking of the special circumstance or the

8   reduction of her conviction to second degree murder.  Rather, the agreement provided that

9   Lawyer would "be sentenced ... to a stipulated term of 15 years to life for violation of [Penal

10  Code section 187, subdivision (a) (murder)] and 1 year consecutive for violation of [Penal Code

11  section 12022, subdivision (a)(1) (firearm enhancement)]."

12         Moreover, contrary to Kelsaw's assertion, the terms of the sentencing agreement

13  did not coerce Lawyer's testimony.  The agreement was valid under California law because it

14  required Lawyer to testify "fully and truthfully."  *See People v. Avila*, 38 Cal.4th 491, 594

15  (2006).  It was permissible that the agreement reflected the parties' mutual understanding that

16  Lawyer had already been truthful in her account to the prosecutor.  *People v. Boyer*, 38 Cal .4th

17  412, 456 (2006).  There was no indication in the agreement or in Lawyer's testimony that she

18  thought she had to conform her testify to a particular version of facts, only that she had to tell the

19  truth as she had done before.  Therefore, the sentencing agreement did not violate the rule of

20  *People v. Medina,* 41 Cal.App.3d at 455, that an accomplice cannot be placed under a strong

21  compulsion to testify in a particular fashion.  As the state superior court found, an objection by

22  counsel that Lawyer's sentencing agreement violated the rule of *Medina* would have been

23  without merit and, as such, properly denied by the trial court.  Trial counsel's failure to make a

24  futile motion does not constitute ineffective assistance of counsel.  *See James v. Borg*, 24 F.3d

25  20, 27 (9th Cir. 1994).

26  /////

1    For this same reason, Kelsaw has also failed to demonstrate that he suffered actual

2    prejudice from trial counsel's omission.  Because no basis appears on which the trial court could

3    have granted an objection to or a motion to exclude Lawyer's testimony, Kelsaw cannot show

4    that, but for counsel's alleged omission, the outcome at trial would have been different.  Kelsaw

5    is not entitled to relief for his claims that trial counsel rendered ineffective assistance of counsel

6    in relation to Lawyer's sentencing agreement or the reduction of her conviction and striking of

7    the special circumstance finding at sentencing in her own separate criminal case.

8

9            2.    Ineffective Assistance by Appellate Counsel in relation to the Sentencing
             Agreement

10    The *Strickland* standards apply to appellate counsel.  *Smith v. Murray*, 477 U.S.

11    527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).  Nevertheless, an

12    indigent defendant "does not have a constitutional right to compel appointed counsel to press

13    nonfrivolous points requested by the client, if counsel, as a matter of professional judgment,

14    decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Appellate

15    counsel "must be allowed to decide what issues are to be pressed." *Id*.  There is no obligation to

16    raise meritless or weak arguments on a client's behalf.  *Miller*, 882 F.2d at 1434; *see also*

17    *Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as

18    prejudice).

19    Here, Kelsaw claims that appellate counsel rendered ineffective assistance in

20    failing to raise on appeal, except by reply brief which forfeited the claim, the contention that the

21    trial court in Lawyer's criminal case unlawfully reduced her conviction from first degree murder

22    to second degree murder.  On state habeas corpus review, the Sacramento County Superior Court

23    disagreed:

24          Appellate counsel performs "properly and competently when he or
      she exercises discretion and presents only the strongest claims

25          instead of every conceivable claim."  (<u>In re Robbins</u> (1998) 18
      Cal.4th 770, 810.)

26

1        ...

2        Petitioner argues that appellate counsel waived the issue of the trial
         court's error in reducing Lawyer's conviction to second degree
3        murder by raising it only in his reply brief.  As discussed above,
         the petition does not show that raising the issue could have affected
4        the outcome of *Petitioner's* trial.  Therefore, he has not shown
         prejudice.

5

6    (*In re Kelsaw*, No. 07F08740, slip op. at 3 (emphasis added)).

7            Kelsaw was not a party to Lawyer's criminal case.  As the state court observed, he

8    had no third party right to object to the reduction of her conviction at her sentencing.  On direct

9    appeal of his own conviction, Kelsaw was limited to demonstrating that the trial court's actions

10   in Lawyer's criminal case conviction somehow affected the fairness of *his* trial.  As previously

11   set forth, however, Kelsaw's trial counsel had no basis to object at his trial, thus, it was not

12   deficient performance for his appellate counsel to omit the issue on appeal.  Kelsaw has also

13   failed to demonstrate that he suffered actual prejudice, since there is no reasonable likelihood that

14   such a claim would have been successful on appeal.  Kelsaw is not entitled to relief for his

15   contention that his appellate attorney provided ineffective assistance of counsel in failing to raise

16   on appeal a claim that Lawyer's conviction was unlawfully reduced to second degree murder in

17   her own separate criminal case.

18           B.      Prosecutor's Mis-Statement of the Law during Closing Argument

19           Kelsaw claims that the prosecutor committed prejudicial misconduct during

20   closing argument when she incorrectly stated to the jury that an accomplice's testimony, referring

21   to Lawyer's, was by itself sufficient under California law to identify Kelsaw as Cordero's

22   kidnapper and killer (petition ground 3).  In the alternative, Kelsaw claims that trial counsel

23   rendered ineffective assistance in failing to object to the prosecutor's error (also petition ground

24   3).

25           At trial, prior to the parties' closing arguments, the trial court properly instructed

26   the jury with CALJIC No. 3.12 as follows:

                                                17

> To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged.  [¶]  However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the crime charged, or that it corroborate every fact to which the accomplice testifies.  [¶]  In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime.  [¶]  If there is no independent evidence which tends to connect defendant with the commission of the crime, the testimony of the accomplice is not corroborated.  [¶]  If there is independent evidence which you believe then the testimony of the accomplice is corroborated.

(Reporter's Transcript ("RT") at 2841-42); *see also* Cal. Penal Code §1111.  This instruction was additionally sent to the jury along with the others in written form.

> In closing argument, defense counsel argued to the jury:

> Number two.  This is the pervading problem of the prosecution. How do we put [Kelsaw] there?  DNA is not in the [motel] room... How'd they put him in there?  Well, we got Terah Lawyer to do it. Oh, yeah, but there's a little rule that the Judge read you about an accomplice.  See, I told you the law was conservative.  You know, longtime ago found out the rule [*sic*].  People who are escaping the news have a tendency, or people who don't want to go along with their compatriots, said he didn't do it, guy folks did it, somebody did it, but I didn't do it.  So, the law has always said an accomplice[:]  You better examine that testimony real careful.  And we even have a rule, you just take that testimony out of the trial, and you see what you got left.  What you got left is then Kweanna Smith and Bruce Moran.  That's all you got [*sic* all].

(RT at 2977-78.)

> During the prosecutor's rebuttal, the following dialogue occurred:

> [Prosecutor:] The other thing that the defense counsel told you is that... you must accept an accomplice testimony, and that if you [ ] have an accomplice testimony you better have other evidence that supports an accomplice because you have to remove [the] accomplice[']s testimony and see if the facts have been proved. To a certain extent he's correct, but you can use an accomplice testimony to prove identity. You don't have to have anything corroborate that. You cannot find defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated

18

1   by other evidence which tends to connect the defendant with the
    commission of the crime. I have to prove the elements of the crime.
2   I have to prove that a murder occurred. I have to prove that a
    kidnap occurred. And when you talk about murder, you talk about
3   a person was killed unlawfully with malice [aforethought]. I don't
    have to use anyone else to prove that [defendant] is the person
4   responsible for this.

5   [Defense counsel:] Objection, that misstates the law.

6   THE COURT: Approach the side bar.

7   (Off the record discussion at the side bar.)

8   THE COURT: Based upon the side bar, I'm going to ask counsel
    to be a little more clear in the statements just made.
9
    [Prosecutor:] Terah Lawyer can come in here and testify as to who
10  did this without having to have any corroboration as to who did
    this. You don't have to have any other corroboration about [who's]
11  the one that did this besides Terah Lawyer...."

12  (RT at 3040-3041.)  The prosecutor then moved on to other areas; defense counsel did not object

13  a second time.

14          On direct appeal, the California Court of Appeal held that Kelsaw had forfeited

15  his claim of prosecutorial misconduct when defense counsel failed to object a second time and

16  obtain a ruling from the court.  The state court went on to reject Kelsaw's alternative claim that

17  trial counsel provided ineffective assistance in failing to preserve the issue for appeal.  The state

18  court reasoned:

19          The prosecutor was apparently confused about the law concerning
            corroboration of accomplice testimony.  First, she said, "You
20          cannot find defendant guilty based upon the testimony of an
            accomplice unless that testimony is corroborated by other evidence
21          which tends to connect the defendant with the commission of the
            crime."  But then she stated the opposite twice, that it was
22          unnecessary to corroborate Lawyer's testimony concerning the
            identity of the perpetrator.  The Attorney General suggests that she
23          may have confused this area of law with the corpus delicti rule.
            (See *People v. Kraft* (2000) 23 Cal.4th 978, 1057 [discussing
24          corpus delicti rule].)  In any event, the prosecutor misstated the law
            concerning corroboration of accomplice testimony.
25
            The Attorney General suggests defense counsel's objection was
26          inadequate to preserve the claim of prosecutorial misconduct for

19

appeal because counsel should have objected again after the
prosecutor again misstated the law.  (*People v. Harris* (2005) 37
Cal.4th 310, 344 [objection necessary to preserve claim of
prosecutorial misconduct].)  A further objection would have
allowed the trial court to clear up the prosecutor's confusion and
admonish the jury to follow the court's instructions concerning
accomplice testimony.  Also, defense counsel did not obtain a
ruling from the court concerning whether the prosecutor's
characterization of the law was accurate.  The claim is therefore
forfeited.

Defendant further contends that, if the claim is forfeited, defense
counsel was ineffective for failing to object.  To conclude counsel
has provided ineffective representation in violation of the right to
counsel, we must find not only that counsel was deficient but also
that there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been
more favorable to the defendant. (*Strickland v. Washington* (1984)
466 U.S. 668, 687-688, 694 [80 L.Ed.2d 674, 693, 698].)

Here, it is unlikely the jurors would have disregarded the trial
court's instructions and, instead, applied the confused argument
presented by the prosecutor.  The trial court properly instructed the
jury concerning accomplice testimony and sent that instruction,
along with the rest, in written form into the jury room.  Defense
counsel reiterated the proper law, and the prosecutor got it right
once, even if she got it wrong twice.  The jurors were admonished
to follow the court's instructions: "You must accept and follow the
law as I state it to you, regardless of whether you agree with it.  If
anything concerning the law said by the attorneys in their
arguments or at any other time during the trial conflicts with my
instructions on the law, you must follow my instructions." (See
CALJIC NO. 1.00.)  "We presume the jury followed the court's
instructions. [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th 839,
871.)

...It is not reasonably probable defendant would have obtained a
more favorable result if defense counsel had further objected to the
prosecutor's characterization of the law concerning accomplice
testimony.

(*People v. Kelsaw*, No. C047832, slip op. at 18-20.)

Respondent asserts that Kelsaw's claim of prosecutorial misconduct based on the

prosecutor's remarks in closing argument is procedurally barred in this court.  As a general rule,

a federal habeas court "'will not review a question of federal law decided by a state court if the

decision of that court rests on a state law ground that is independent of the federal question and

1  adequate to support the judgment.'" *Calderon v. United States District Court (Bean)*, 96 F.3d

2  1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  An

3  exception to this general rule exists if the prisoner can demonstrate either cause for the default

4  and actual prejudice as a result of the alleged violation of federal law, or that failure to consider

5  the claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.

6          Since procedural default is an affirmative defense, respondent bears the burden of

7  pleading and proving that the state procedural bar is adequate and independent while Kelsaw

8  bears the interim burden of placing the adequacy of the defense at issue.  *See Bennett v. Mueller*,

9  322 F.3d 573, 585 (9th Cir. 2003).  Here, respondent met the initial burden by pleading that this

10  prosecutorial misconduct claim is procedurally defaulted for Kelsaw's failure to object at trial.

11  Thus, the burden shifted to Kelsaw to place the adequacy of California's contemporaneous

12  objection rule into question as "the scope of the state's burden of proof thereafter will be

13  measured by the specific claims of inadequacy put forth by the petitioner." *Bennett*, 322 F.3d at

14  584-85.

15          In this case, Kelsaw has offered no argument that the contemporaneous objection

16  rule invoked by the state court was not an independent and adequate basis for its decision.  Nor

17  has he demonstrated cause for his default or that a miscarriage of justice would result if his claim

18  is not heard.[1]  Accordingly, review of his prosecutorial misconduct claim is barred.  Kelsaw has

19  failed to satisfy his interim burden under *Bennett* and it must be concluded that the state

20  procedural bar applied to his case rests on an independent and adequate state procedural ground.

21  *See generally  King v. Lamarque*, 464 F.3d 963, 967 (9th Cir. 2006) ("*Bennett* requires the

22  petitioner to 'place [the procedural default] defense in issue" to shift the burden back to the

23  government"); *Paulino v. Castro*, 371 F.3d 1083 (9th Cir. 2004) (finding that California's

24  contemporary objection rule precluded federal habeas review); *Melendez v. Pliler*, 288 F.3d

25  ─────────────

26          [1] Kelsaw filed a traverse but made no specific allegations as to the adequacy of the state procedural bar or his default therein.

1120, 1124-25 (9th Cir. 2002) (holding that California's contemporaneous objection rule is an

independent and adequate state ground).

Even if this claim were not procedurally barred, its merits would not warrant

relief.  The standard of review for a claim of prosecutorial misconduct on writ of habeas corpus

is the narrow one of due process.  *Darden v. Wainwright*, 477, U.S. 168, 181 (1986).  A

prosecutor's error does not, per se, violate a petitioner's constitutional rights.  *See Jeffries v.*

*Blodgett,* 5 F.3d 1180, 1191 (citing *Darden*, 477 U.S. at 181 and *Campbell v. Kincheloe*, 829

F.2d 1453, 1457 (9th Cir. 1987)).  A criminal defendant's due process rights are violated by a

prosecutor's error or misconduct only if it renders the trial fundamentally unfair.  *Darden*, 477

U.S. at 181.  Relief is limited to cases in which the petitioner can establish that the misconduct

resulted in actual prejudice.  *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Brecht*

*v. Abrahamson*, 507 U.S. 619, 637-38).

In the context of Kelsaw's entire trial, the prosecutor's misstatement of the law

did not render his resulting conviction fundamentally unfair.  The jurors were admonished to

follow the court's instructions: "You must accept and follow the law as I state it to you,

regardless of whether you agree with it.  If anything concerning the law said by the attorneys in

their arguments or at any other time during the trial conflicts with my instructions on the law, you

must follow my instructions." (RT at 2827.)  The jury was properly instructed with CALJIC 3.12

that corroboration of accomplice testimony is required, and further received this instruction in

written form.  It must be presumed that the jury followed these instructions.  *See Greer v. Miller*,

483 U.S. 756, 766 at n.8 (1987).  In this case, there are no circumstances suggesting that the jury

misapplied California's accomplice testimony corroboration requirement.  It is not reasonably

probable that the jurors disregarded the trial court's written and oral instructions on corroboration

of accomplice testimony in favor of the confusing argument presented by the prosecutor.

Accordingly, Kelsaw has not demonstrated that he suffered prejudice.  For this same reason, his

alternate claim that trial counsel rendered ineffective assistance in failing to preserve this issue

1  for appeal is also without merit. *Miller v. Keeney*, 882 F.2d at 1434 (counsel's omission of

2  meritless or weak arguments on appeal is not deficient performance); *Strickland*, 466 U.S. at

3  687-94 (in the absence of actual prejudice, counsel was not ineffective).

4         C.     Grounds Related to Allegations of Jury Misconduct

5         Kelsaw presents a handful of grounds for relief relating to allegations of possible

6  jury misconduct at trial.  First, Kelsaw contends that the trial court erred in denying his motion

7  for a new trial based on evidence that Juror 9 made a racially biased comment during

8  deliberations (petition ground 7); he further contends that the trial court erred in precluding

9  additional inquiry into allegations of juror misconduct (petition grounds 7 and 16).  Kelsaw

10 further alleges that appellate counsel failed to raise two claims on direct appeal: first, a claim that

11 the trial court erred in declining to unseal and release the juror's personal identifying information

12 (petition ground 16), and second, a claim that the jury's verdict was influenced by extraneous

13 information from Juror 12 about soil properties (petition ground 19).

14

15        1.     Alleged Trial Court Error on the Motion for New Trial and Inquiry into Juror Misconduct

16        Kelsaw contends that the trial court erroneously denied his motion for new trial

17 premised on juror bias and improperly precluded him from adequately questioning the jurors

18 about possible misconduct (petition ground 7).

19        After verdict, Kelsaw filed a new trial motion asserting that Juror 9 had made an

20 improper comment during deliberations.  In support, he produced an affidavit from Juror 7, who

21 was later questioned herself about possible misconduct and ultimately dismissed for medical

22 hardship.  Juror 7's affidavit included the following paragraph:

23            I was concerned during deliberations that certain jurors wanted to decide the case based on [Kelsaw]'s lifestyle. One juror, whose

24            first name was [omitted] indicated that [Kelsaw] was 'peddling pussy.' The phrase in quotation marks is the exact phrase that he

25            used. I thought a lifestyle was not an appropriate topic on which to base a verdict. I attempted to keep the jury on track, but the stress

26            of it all contributed to my fibromyalgia and rendered me unable to

1    walk so that I personally needed to be excused for medical reasons.

2  (*People v. Kelsaw*, No. C047832, slip op. at 31.)

3    The trial court denied Kelsaw's motion for a new trial, reasoning:

4    As to... a statement made by [Juror 9] that [Kelsaw] was peddling
     pussy and thereby improperly considering lifestyle[:] The pussy-
5    peddling comment was not impermissible discussion about the
     evidence.  The defense submitted evidence to the jury that Terah
6    Lawyer has had a history of prostitution activity.  The jury could
     have made an [assumption that] her address book referenced her
7    prostitution activity and that the jury also had before it a great deal
     of evidence regarding the relationship between Mr. Kelsaw and
8    Ms. Lawyer.

9    One or more of the jury's [*sic*] conclusion that [Kelsaw] and Terah
     Lawyer were directly involved in prostitution activity, therefore
10   providing the motive for killing, was a fair inference to be drawn
     from the evidence. Such a conclusion, if made, was not improper
11   speculation.

12 (RT at 3172-73.)

13    On direct appeal, the California Court of Appeal, Third District, rejected Kelsaw's

14 claim that the trial court had erred in denying his motion for new trial based on the alleged bias

15 of Juror 9:

16   We must reverse a denial of a motion for new trial based on juror
     bias if there is a substantial likelihood a juror's misconduct
17   demonstrated actual bias against defendant. (*People v. Ault* (2004)
     33 Cal.4th 1250, 1263.) [Kelsaw] contends the juror's "statement
18   that [Kelsaw] was peddling pussy was not only extremely
     derogatory and not based on any evidence, but the statement also
19   reflected racial stereotyping that African-American males are more
     likely to be pimps when they have many girlfriends and are
20   financially well off. The evidence showed [Kelsaw] to be a seller
     of CDs, not a pimp, but here was a juror concluding that [Kelsaw]
21   was a pimp. This was racial stereotyping, and the trial court erred
     in failing to recognize the bias reflected in the juror's statement."
22
     Here, it is [Kelsaw]'s contention that finds no support in the
23   evidence. Although the juror's conclusion was unwarranted
     because the fact that Lawyer had been arrested for prostitution was
24   admitted only for impeachment purposes, there is no evidence the
     juror was biased against [Kelsaw] because of race. There is... no
25   evidence that the juror held any feelings of animosity for African-
     Americans. [Kelsaw]'s assertion is simply unfounded.
26

24

1   (*People v. Kelsaw*, No. C047832, slip op. at 32-33.)

2          The Sixth Amendment guarantees criminal defendants a verdict by impartial,

3   indifferent jurors.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "Evidence developed against a

4   defendant must come from the witness stand."  *Fields v. Brown*, 503 F.3d 755, 779 (9th Cir.

5   2007).  When the jury breaches its duty to decide the case based solely on the evidence

6   introduced at trial, by considering extraneous facts not introduced in evidence, "a defendant has

7   effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with

8   regard to jury consideration of the extraneous evidence."  *Hughes v. Borg*, 898 F.2d 695, 699

9   (9th Cir. 1990) (*quoting Gibson v. Clanon*, 633 F.2d 851, 854 (9th Cir. 1980).  However, "the

10  extent, if at all, to which the jurors saw or discussed the extrinsic evidence," is a question of

11  historical fact as to which the state court's findings are entitled to a presumption of correctness.

12  *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir. 1988); *see also* 28 U.S.C. §2254(e).

13         Jurors need not "be totally ignorant of the facts and issues involved."  *Irvin*, 366

14  U.S. at 722.  "It is sufficient if the juror can lay aside his impression or opinion and render a

15  verdict based on the evidence presented in court."  *Id*. at 723.  Impartiality is "a state of mind" for

16  which "the Constitution lays down no particular tests and procedure is not chained to any ancient

17  and artificial formula."  *Id*. at 724-25; *see also Parker v. Gladden*, 385 U.S. 363, 365 (1966).

18         In this case, Juror 9's alleged comment that Kelsaw was "peddling pussy" does

19  not support an inference of bias, racial or otherwise.  Kelsaw's argument that "accusing [Kelsaw]

20  of being a pimp was racial stereotyping and had racial overtones" is wholly unsupported.  It

21  simply is not clear what correlation exists between race and the "peddling pussy" comment.

22         It should further be noted that the trial court expressly found Juror 7 to be not

23  credible in her post-trial allegations regarding other jurors.  (*See* subsection (C)(2), *infra*.)

24  Moreover, although the prostitution evidence regarding Lawyer was admitted solely for

25  impeachment purposes, Juror 9's comment was based on the evidence and did not reflect bias or

26  prejudice.  The comment does not tend to show that Juror 9 was unable render a verdict based

1  solely on the evidence presented in court.  Kelsaw points to nothing in voir dire or the rest of the

2  record demonstrating that Juror 9 was biased or otherwise unable to render a verdict unaffected

3  by extraneous information.[2]  *See Irvin*, 366 U.S. at 724-25; *Estrada*, 512 F.3d at 1240-41.

4          On this record, the state court reasonably concluded that Kelsaw's assertion of

5  racial bias was wholly unfounded.   The rejection of his due process claim in this regard is not

6  contrary to, or an unreasonable application of any clearly established Supreme Court precedent,

7  nor based on an unreasonable determination of the facts in light of the evidence.

8          In a related contention, Kelsaw claims that the trial court erroneously refused to

9  allow additional questioning of Juror 7 prior to her excusal for medical hardship (petition

10  grounds 7 & 16).  As discussed *infra*, in subsection (C)(2), Juror 7 alleged that other jurors had

11  interjected extraneous information into the deliberative process.  Specifically, Kelsaw contends

12  that further questioning could have revealed at that time the allegation she ultimately made in her

13  post-trial declaration: that Juror 9 stated Kelsaw was "peddling pussy."  Petitioner presented this

14  claim on state habeas corpus review, however, it appears that it was not expressly resolved in a

15  reasoned opinion.  Thus, an "independent review" is warranted, although the usual deference is

16  still afforded to the state court's unexplained denial.  *See Allen v. Ornoski*, 435 F.3d 946, 955

17  (9th Cir. 2006).

18          In the case of an allegation of juror misconduct, "a post-trial hearing is adequate

19  to discover whether [the defendant] was prejudiced" by that alleged misconduct.  *Rushen v.

20  Spain*, 464 U.S. 114, 119 at n.3 (1983); *see also Smith v. Phillips*, 455 U.S. 209, 218 (1982)

21  (upholding post-trial hearing as an adequate remedy to determine prejudicial effect of juror

22  misconduct).  However, such a hearing is not constitutionally required unless a sufficiently

23  strong showing of misconduct has been made.  *See generally Tanner v. United States*, 483 U.S.

24

25          [2]As discussed *infra* in subsection (C)(2), Juror 9 was one of two jurors who alerted the
    trial court about Juror 7's improper interjection of extraneous information from a newspaper
26  article into deliberations.  (Clerk's Transcript ("CT") at 1057.)

107, 126 (1987).  This standard recognizes that a criminal defendant's Sixth Amendment interests are already adequately protected by several aspects of the trial process, including voir dire, observation during trial by the court, counsel, and courtroom personnel, and observation by fellow jurors.  *Id.* at 127.

Thus, clearly established Supreme Court precedent does "not stand for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias."  *Sims v. Rowland*, 414 F.3d 1148, 1155 (9th Cir. 2005).  "Rather, read in combination, [Supreme Court precedent] provide[s] a 'flexible rule.'"  *Id.*  While not binding in this habeas corpus proceeding, Ninth Circuit cases similarly hold that

> a federal court is not required to hold a hearing in order to comply with due process, but should "consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source" when determining whether a hearing is required.

*Id.*

In this case, as the trial court determined, there was no indication of misconduct or bias, either during or after trial, on the part of any juror other than Juror 7 herself (see subsection (C)(2), *infra*), who was ultimately excused for medical hardship.  Accordingly, additional inquiry into Juror 7's unsupported allegations of misconduct by other jurors was not constitutionally required.  The state court's unexplained rejection of petitioner's claim that the trial court erred in failing to hold a post-trial hearing on possible juror misconduct is not contrary to, or an unreasonable application of clearly established Supreme Court precedent.  *See Tanner*, 483 U.S. at 126.

2.      Ineffective Assistance of Appellate Counsel in Relation to Possible Jury Misconduct

Concurrently with his motion for new trial alleging juror misconduct, Kelsaw filed a request for release of the jury members' personal identifying information in order to

27

1    investigate possible misconduct.  The trial court denied the motion for new trial and ruled against

2    unsealing the juror's personal information.  On direct appeal, Kelsaw's appellate attorney did not

3    challenge the trial court's ruling.  Kelsaw claims here that his appellate attorney rendered

4    ineffective assistance of counsel based on this omission (petition ground 16).  Kelsaw also claims

5    appellate counsel should have raised on direct appeal a claim of juror misconduct in relation to

6    Juror 12's alleged comment about soil properties (petition ground 19).

7           A detailed recitation of facts is helpful to understanding petitioner's allegations in

8    this regard.  As previously set forth, Lawyer initially told detectives that a person named "Trent"

9    had asked her to bring Cordero to the Motel 6.  Later, at Kelsaw's trial, she testified that Trent

10   was a concocted person that she made up at that time to avoid revealing Kelsaw's identity.

11          On April 20, 2004, during deliberations, Jurors 1 and 9 each sent a note to the

12   court, advising that Juror 7 had referenced contents of a newspaper article about Lawyer's

13   unrelated embezzlement case when explaining her deliberative thought process in Kelsaw's case.

14   (CT at 1056-57.)  Specifically, based on the contents of the newspaper article, Juror 7 had stated

15   that "Trent" was a real person.  Subsequently, each juror was individually questioned by the trial

16   court.  Each juror, including Juror 7, confirmed that Juror 7 had stated that "Trent" was real

17   based upon the contents of the newspaper article.  (RT at 3068-71 (Juror 6), 3071-75 (Juror 12),

18   3075-77 (Juror 5); 3077-80 (Juror 11), 3080-82 (Juror 4), 3082-85 (Juror 10), 3085-87 (Juror 3),

19   3087-89 (Juror 9), 3089-92 (Juror 2), 3092-94 (Juror 8), 3095-98 (Juror 1), 3098-4003 (Juror 7).)

20          Each juror other than Juror 7 was asked whether Juror 7 had relayed any other

21   extraneous information from the newspaper article.  Each responded in the negative.  (RT at

22   3069, 3073, 3076, 3078, 3081, 3083, 3086, 3088, 3090, 3093, 3095.)  Each of the 11 other jurors

23   also indicated that they would be able to ignore the extraneous information from Juror 7 about

24   "Trent" and base their verdict solely upon the trial evidence.  (RT at 3070, 3074, 3076-77, 3079,

25   3082, 3084, 3086-89, 3091, 3094, 3096.)

26   /////

Juror 7, when asked by the trial court, stated that she had read the newspaper article "[l]ast year sometime."  (RT at 3098.)  She explained "some of the kids that I know knew some of the names" in the article.  (RT at 3099.)  Juror 7 denied speaking to these "young adults" about the trial and insisted she had only spoken to them when the information initially appeared in the newspaper.  (RT at 3099.)  When the court asked Juror 7 whether any of the "names" recognized from the article were witnesses who had testified at Kelsaw's trial, the following dialogue took place:

| | | |
|---|---|---|
| [Juror 7]: | No.  No.  It was not the people.  Because apparently the circle was wider than what -- (pausing). |
| [Court]: | What circle was that? |
| [Juror 7]: | The embezzlement circle. |
| [Court]: | One of the instructions in this case required that you make a decision in this matter based solely on the evidence received in the trial and not from any other source. |
| [Juror 7]: | Correct. |
| [Court]: | Sounds like you have gone beyond that and gone to other sources. |
| [Juror 7]: | No.  Because everyone is thrown [*sic*] in things that were not heard in this courtroom at this trial. |
| [Prosecutor]: | I am sorry; I can't hear. |
| [Juror 7]: | Everyone has made statements about things in that deliberation room that were not discussed in this courtroom during this trial. |
| [Court]: | Can you give me examples? |
| [Juror 7]: | Speculative things [like:] "This wasn't proven, but.[..]" |
| | [and] "What if this happened?" |
| | Different scenarios of how it could have gone -- that was not discussed in here. |

/////

29

> Scenarios about different people's lifestyles.  And
> how they got what they had.

(RT at 3099-3100.)  Shortly thereafter, Juror 7 requested that she be excused from the jury

because the stress of jury service was exacerbating her preexisting "fibromyalgia" medical

condition.  (RT at 3011-03.)

    The trial court granted Juror 7's request to be excused and she was replaced by

Alternate Juror 1 (RT at 3115-16.)  Defense counsel requested that the court make additional

inquiry of the other jurors into Juror 7's allegations that others had talked about "speculative"

things during deliberations.  The trial court declined to inquire further into the juror's

deliberative process, finding no indication that any such discussions had been held based on

outside information:

> [The deliberative process is] not an area that the Court should
> inquire into. [¶] There's nothing about what was said that gives the
> Court any sort of alarm to investigate exactly what scenario they're
> referring to, nothing to indicate that it was information that they
> were referring to which was outside the record.  And the Court did
> ask the question, asked her to explain that. [¶] So, therefore, based
> on that analysis, I will not ask the jury additional questions nor ask
> any of the other jurors any questions about the scenarios.

(RT at 3106.)  The court also noted that Juror 7's comment about the other jurors' "speculative"

discussions appeared to be "an attempt to justify what had taken place, her behavior."  (RT at

3105.)  The court expressly indicated that, if counsel were to request a mistrial, it would find that

Juror 7 had engaged in misconduct by failing to follow the court's instructions, but that the

remaining 11 jurors did not engage in any such misconduct because they had all declined to

discuss the outside information mentioned by Juror 7.  (RT at 3112.)

    The jury reached its verdict on April 29, 2004.  After the verdict was read, several

jurors agreed to speak with the attorneys about the case.  That same day, the court sealed all juror

identifying information pursuant to state law.  *See* Cal. Code Civ. Proc. §237(a)(2) ("Upon the

recording of jury's verdict in a criminal jury proceeding, the court's record of personal juror

identifying information... consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section.").

On June 18, 2004, Kelsaw filed a motion for a new trial alleging juror misconduct.  The allegations of jury misconduct were based upon declarations from the following individuals: Alternate Juror 2, who ultimately served on the jury (CT 1170-71; RT at 3169); Alternate Juror 3, who also served on the jury (CT at 905, 1172-73; Juror 3 (CT at 1174-75); and excused Juror 7.  (CT at 1176-78.)  Kelsaw first alleged, based upon the four declarations, that Juror 12 had interjected his own expertise concerning the elastic properties of soil into the deliberative process.  (CT at 1161, 1193-95.)  Kelsaw's remaining allegations were based solely on information contained in Juror 7's declaration.  Specifically, Kelsaw alleged that Juror 2 had prejudged the case, as he had reportedly stated that he would "nail the little fucker" for putting the victim's grandmother through so much heartbreak.  (CT at 1162-63, 1190-91.)  Kelsaw further alleged that Juror 9 was racially biased, as evidenced by his supposed description of Kelsaw's lifestyle as "peddling pussy."  (CT at 192-93; *see also* subsection (C)(1), *supra*.)  Finally, Kelsaw alleged that each juror had been exposed to outside information, as Juror 7 had reported that all the jurors knew that the victim's grandmother was present in the courtroom, (CT at 1162, 1198.)

Kelsaw filed an accompanying motion requesting the release of the juror's personal identifying information in order to further investigate these allegations of jury misconduct.  (CT at 1202-07.)  At a hearing on the motion, defense counsel acknowledged that he had recently obtained the jurors' home addresses through public records, but stated that he "really want[ed] their "cell phone numbers and telephone numbers" in order to contact the jurors as quickly as possible without expending any additional resources for investigation.  (RT at 3154.)

The trial court found insufficient cause to warrant release of the jurors' personal identifying information.  (RT at 3156-57.)  The court noted that counsel could seek their

1   telephone numbers from telephone directories since counsel already knew their names and

2   addresses.  The court added that no further investigation was necessary in order to rule on

3   Kelsaw's underlying claims of juror misconduct.

4           The trial court concluded that each allegation of juror misconduct lacked merit.

5   Specifically, the court found that the soil comments attributed to Juror 12 were not offered in any

6   expert capacity, were supported by trial testimony, and also fell within the realm of common

7   knowledge.  (RT at 3173-74.)  To the extent Juror 7's declaration indicated otherwise, the court

8   found she "lacked credibility" given the fact that no other juror, including Juror 7, had previously

9   made such an allegation in response to the court's inquiries.  Alternatively, the court found that

10  the soil comments did not cause Kelsaw to suffer any prejudice.  (RT at 3174.)

11          The trial court concluded, based on Juror 7's lack of credibility and Juror 2's

12  contrary declaration, that Juror 2 did not state that he wanted to "nail" Kelsaw.  (RT at 3171-72.)

13  In a related finding, the court found that the entire jury had not been informed by any outside

14  source that the victim's grandmother was present in the courtroom, in light of the jurors'

15  responses in the previous hearing and Juror 7's poor credibility.  (RT at 3169-72.)  The court

16  accepted Juror 2's indication that Juror 7 had informed him that the victim's grandmother and

17  Kelsaw's father were present in the courtroom.  But the court concluded that Juror 2's failure to

18  reveal that statement by Juror 7 did not constitute misconduct.  Alternatively, the court found that

19  this omission by Juror 2 did not cause any prejudice to Kelsaw.  (RT at 3174.)

20          Turning to the ineffective assistance of counsel claim at issue, Kelsaw first

21  contends that his appellate attorney should have challenged the trial court's decision not to unseal

22  the juror's personal information on direct appeal.   Kelsaw presented this claim on state habeas

23  corpus review.  The Sacramento County Superior Court rejected the claim, reasoning:

24          [Kelsaw]... has not attached... evidence supporting his claim.  In
            addition, he has not shown that the motion should have been
25          granted.  He acknowledges that for a motion to be successful, he
            must have shown that diligent efforts were made to contact the
26          jurors through other means.  However, in the declaration in support

of the motion, counsel stated: I *may* well be unable to obtain the
addresses and telephone numbers of jurors through other means..."
(emphasis added) and did not document any efforts to contact the
jurors.  Therefore, [Kelsaw] has not shown that counsel should
have raised the issue on appeal or that raising the issue likely
would have made a difference in the outcome of the appeal.

(*In re Kelsaw*, No. 07F08740, slip op. at 4.)

The applicable state standard for the post-trial unsealing of juror information is contained in section 237(b) of the California Code of Civil Procedure.  A party seeking to unseal juror personal information must establish "a prima facie showing of good cause for the release."  Cal. Code Civ. Proc. § 237(b).  Good cause in this context means "a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial."  *People v. Rhodes*, 212 Cal.App.3d 541 (1989) (superceded by statute).  Although *Rhodes* was decided before the present enactment of section 237, its test "survived the amendment."  *People v. Carrasco*, 163 Cal. App. 4th 978, 990 (2008).  Importantly, the trial court's ruling on a section 237(b) request is subject to review only for an abuse of discretion.  *Id*.

In this case, good cause to unseal the juror information did not exist.  As the state superior court found, the defense did not show "diligent efforts" to contact the jurors through other means, or that further investigation was necessary for the court to rule on the motion for new trial.  *See Rhodes*, 212 Cal. App. 3d at 552.  Thus, a claim that the trial court erred in refusing to unseal the information would have been extremely weak, especially considering the deferential "abuse of discretion" standard that would have applied on appellate review.  Moreover, the state court expressly determined, as a matter of state law, that the trial court properly denied the request for juror personal identifying information.  The state court's interpretation and application of state law is binding on this court.  *See Bradshaw*, 546 U.S. at 76.  Under these circumstances, Kelsaw fails to demonstrate deficient performance on the part of

33

1  appellate counsel or that prejudice resulted.  *See Strickland*, 466 U.S. at 689, 694.

2          As previously set forth, in a related claim, Kelsaw contends that appellate counsel

3  should also have asserted on appeal that Juror 12 committed prejudicial misconduct by allegedly

4  interjecting his own knowledge about soil properties into the deliberative process (petition

5  ground 19).  At trial, a theory of the defense was presented that soil "shrinks" when it loses water

6  volume, and thus the footprint in the Costco parking lot which appeared to match Kelsaw's shoe

7  size was not actually a "match."

8          The constitutional right to jury trial "necessarily implies at the very least that the

9  'evidence developed' against a defendant shall come from the witness stand in a public

10  courtroom where there is full judicial protection of the defendant's right to confrontation, of

11  cross-examination, and of counsel."  *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965).  Jurors

12  "cannot act in any case upon particular facts material to its disposition resulting in their private

13  knowledge, but should be governed by the evidence adduced."  *Head v. Hargrave*, 105 U.S. 45,

14  49 (1881).  A juror "may not bring into the jury room evidence developed outside the witness

15  stand, such as the results of a juror's experiment... or legal research..."  *Grotemeyer v. Hickman*,

16  393 F.3d 871, 878 (9th Cir. 2004).

17          Nevertheless, jurors "may, and to act intelligently they must, judge [ ] the weight

18  and force of that evidence by their own general knowledge of the subject of inquiry."  *Head v.

19  Hargrave*, 105 U.S. at 49.  Thus "a juror's past personal experiences may be an appropriate part

20  of the jury's deliberations."  *Grotemeyer*, 393 F.3d at 879.

21          Here, Alternate Juror 3 declared that one of the jurors, who was an engineer,

22  commented that "soil or footprint... would not shrink, and, if anything, it would expand; not

23  shrink in, rather it would expand out."  (CT at 1172.)  Juror 3 similarly declared that another

24  juror, who was employed by a soil engineering firm, rendered an opinion "regarding the way soil

25  dries."  (CT at 1174.)  Juror 7 similarly declared that one juror, who was "a hydraulic engineer,"

26  informed the jury that "he had knew [*sic*] that soil at the crime scene was not like the soil

described by the defense attorney and that it would not shrink." (CT at 1177.) Alternate Juror 2, who never became part of the jury, declared that one of the jurors had told him, after the verdict, that "the way [soil] would shrink when it dried was not the way it had been described during testimony." (CT at 1170.)

Juror 12 offered his perception of the soil evidence presented at trial; however, as the trial court found, his alleged statements were within the realm of common knowledge. (RT at 3173-74.) Significantly, none of the jurors expressed any concern to the trial court, either during or after the misconduct inquiry, that Juror 12 had interjected new or extraneous information into the deliberative process. (RT at 3067-3100.) The trial court reasonably found (RT at 3173-74) that Juror 12 had permissibly evaluated the trial evidence in light of his own personal experience. *See Grotemeyer*, 393 F.3d at 878-80 ("Evaluation of [witness] credibility necessarily relies on experience... [¶] ...Were we to require the impossible and prohibit jurors from relying on relevant, past personal experience, about all we would accomplish would be to induce jurors to lie about it when questioned afterward."); *see also Hard v. Burlington Northern R. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989) (finding no misconduct where juror offered interpretation of x-ray evidence based upon his own specialized knowledge in this area).

Therefore, appellate counsel was not deficient for declining to raise a meritless claim on appeal. *See Strickland*, 466 U.S. at 686. Moreover, even if Juror 12's comments were inappropriate, prejudice is lacking based on the relative insignificance of the soil and footprint evidence (*see* subsection (E)(1), *infra*), especially in light of the overwhelming evidence implicating Kelsaw in the murder. *See Strickland*, 466 U.S. at 694.

    D.    Additional Allegations of Trial Court Error

        1.    Rap Lyrics

Kelsaw contends that his trial was rendered fundamentally unfair in violation of due process when the trial court admitted rap lyrics he authored while in jail (petition ground 6). The California Court of Appeal, Third District, set forth the background for this claim:

1    While in jail, [Kelsaw] composed rap songs. When Latoya Horne
     visited him, he performed the songs for her. The conversation,
2    along with the performance, was recorded. At trial, the prosecution
     sought to introduce parts of the rap lyrics as admissions...
3
     ...
4
     The lyrics the prosecution sought to introduce and to which
5    defendant objects are as follows:

6    "Living dangerous with the stainless, I was invincible."

7    "Calling shots like a ref in the game of life, game of strife, slinging
     white, but my aim ain't right. Money was cool, but the ones I loved
8    felt neglected. Wish I could go back to the times that the shells
     ejected."
9
     "This is the life that I live and won't-and don't want to go back
10   to...." (Ellipses in original.)

11   "Arraignments, preliminary and trial dates, I been through it all,
     dog. I had a wild fate. District Attorney trying to cut deals with co-
12   defendants to testify on me and give them a shorter sentence."

13   "I was living life too fast, headed for disaster."

14   (*People v. Kelsaw*, No. C047832, slip op. at 28-29.)  Kelsaw's attorney objected to admission of

15   these lyrics; however, when the trial court indicated the above lyrics would be admitted, counsel

16   moved the court to admit all of the lyrics pursuant to section 356 of the California Code of

17   Evidence.  Kelsaw's rap songs were admitted in their entirety.  The jury was then instructed that:

18   An admission is a statement made by the defendant which does
     not, by itself, acknowledge his guilt of the crimes for which the
19   defendant is on trial, but which statement tends to prove his guilt
     when considered with the rest of the evidence.
20
     You are the exclusive judge's as to whether the defendant made an
21   admission, and if so, whether that statement is true in whole or in
     part.  Evidence of an oral admission of the defendants not made in
22   Court should be viewed with caution.

23   (RT at 2837.)

24   On direct appeal, the state appellate court rejected Kelsaw's claim that admission

25   of the songs violated due process:

26   /////

36

The rap songs were relevant in that they contained statements the jury could reasonably view as admissions. For example, [Kelsaw]'s lyrics included allusions to shooting a gun and to the proceedings against him. [Kelsaw]'s assertion that there are no admissions in the lyrics is wrong. [Kelsaw] stated he wished he could go back to the times that the shells ejected.

[Kelsaw] claims the lyrics were purely for entertainment. He said so when Horne came to visit, telling her, "It's entertainment, for the D.A., it's just entertainment...." Establishing that the lyrics were entertainment says nothing about their truth. Nor does it determine their admissibility. Relevant statements in a rap song can be admissible. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.) The purpose and truth of the defendant's songwriting was for the jury to decide.

We also disagree with [Kelsaw]'s assertion that the rap songs constituted impermissible character evidence. Evidence Code section 1101, subdivision (a) generally bars admission of character evidence to prove conduct on a specific occasion. The rap songs, however, discussed the crimes.

The trial court indicated it would admit only those portions that could be viewed as admissions specific to this case. The prosecution therefore sought for limited admission of those parts that it believed related to this case. The court ruled that even some of the parts the prosecution believed were admissions would not be admitted. After the court indicated the parts it would admit (see the lyrics recounted above), [Kelsaw] moved to admit the entirety of the rap songs under Evidence Code section 356 to put it all in context. The parts of the rap songs, quoted above, that the court determined were admissible, did not deal with general lifestyle or propensity. The jury could reasonably infer that they reflected [Kelsaw]'s actions in this case: using the "stainless" (a gun), ejecting shells, going through court proceedings, and having a witness testify against him in exchange for sentence considerations. This was not impermissible character evidence.

Citing Evidence Code section 352, [Kelsaw] contends the prejudice from playing the rap songs for the jury substantially outweighed the probative value. As noted in *Olguin,* "[t]he mere fact the lyrics might be interpreted as reflective of a generally violent attitude could not be said 'substantially' to outweigh their considerable probative value. It looks to us like the trial court got it right; certainly it has not been shown there was any abuse of discretion." (31 Cal.App.4th at p. 1373.) The same is true here.

Finally, [Kelsaw] asserts admission of the rap songs was prejudicial and a violation of federal due process rights because it led to conviction based on propensity evidence. This assertions

1   fails because we have already determined the rap songs were not
    improperly admitted as propensity evidence.
2

3   (*People v. Kelsaw*, No. C047832, slip op. at 29-31.)

4          On federal habeas corpus review of this claim, the sole question is "whether the

5   admission of the evidence so fatally infected the proceedings as to render them fundamentally

6   unfair." *See Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991); *see also Estelle*, 502

7   U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a

8   conviction violated the Constitution, laws, or treaties of the United States"). "[P]etitioner bears a

9   heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v.*

10  *Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005). "Admission of evidence violates due process only

11  if there are no permissible inferences the jury may draw from it." *Id.* (internal quotation

12  omitted); *see also Estelle*, 502 U.S. at 68-70 (rejecting due process challenge to admission of

13  prior-bad-act evidence because it "was relevant to an issue in the case"). Even upon such a

14  showing, habeas corpus relief may not be granted unless the admission of the evidence had a

15  "substantial and injurious effect" upon the jury's verdict. *Brecht*, 507 U.S. at 622.

16         As an initial matter, Kelsaw's assertion that the lyrics amounted to

17  constitutionally impermissible propensity evidence is without merit. As the state appellate court

18  found, the lyrics did not speak to Kelsaw's lifestyle or propensity to commit any particular

19  crimes. To the contrary, the lyrics appeared to relate to particular events, whether based on fact,

20  fiction, or some combination thereof. In any event, the "Supreme Court has never expressly held

21  that it violates due process to admit other crimes evidence for the purpose of showing conduct in

22  conformity therewith." *Alberni v. McDaniel*, 458 F.3d 860, 863 (9th Cir. 2006). To the contrary,

23  the high court expressly reserved determination of this question in *Estelle v. McGuire*, 502 U.S.

24  62 (1991). *See Alberni*, 458 F.3d at 863 (holding that Supreme Court precedent does not clearly

25  establish a criminal defendant's right to exclude evidence of prior crimes to establish propensity

26  to commit a charged crime).

1    In any event, here, the jury could have drawn various permissible inferences from

2    the admission of the rap lyrics authored by Kelsaw.  Kelsaw was heard to state before performing

3    the lyrics: "It's just rap music.  It's just entertainment.  It's entertainment, for the D.A., it's just

4    entertainment, all right?"  (CT at 1289.)  Thus, the jury could have inferred that Kelsaw's lyrics

5    did not relate to his personal experiences, but rather, that they were fictional or hypothetical, and

6    for entertainment purposes only.  Alternatively, the jury could have reasonably viewed portions

7    of the lyrics as admissions relating to the charges in the case being tried.  Either inference was

8    permissible.  Accordingly, admission of the rap lyrics did not violate Kelsaw's right to due

9    process.  *Boyde*, 404 F.3d at 1172.

10    Nor is there any reasonable likelihood that the admitted rap lyrics had a

11    substantial and injurious effect on the jury's verdict.  The portions of the lyrics that could

12    reasonably be viewed as admissions are brief and not *directly* incriminating.  The lyrics inculpate

13    Kelsaw only to the extent an additional inference is made that the lyrics speak to the charges in

14    the case being tried.  More importantly, in the face of substantial other direct and circumstantial

15    evidence of Kelsaw's guilt, the probative value of the rap lyrics was insignificant.  The lyrics

16    were, most likely, not a determinative factor for the jury's verdict.  In sum, the state court's

17    rejection of Kelsaw's due process challenge is not contrary to, or an unreasonable application of

18    clearly established Supreme Court precedent.

19    As an alternative to his due process claim, Kelsaw alleges that trial counsel

20    rendered ineffective assistance of counsel in failing to make proper objections to the rap lyrics in

21    order to preserve a claim brought under the Due Process Clause of the United States Constitution

22    (petition ground 6).  Kelsaw admits, and the record reflects, that trial counsel objected to the

23    admission of the rap lyrics as allegedly improper "other crimes" evidence.  (RT at 2707-08.)  The

24    trial court denied counsel's objections, admitting portions of the lyrics.  (RT at 2741-42.).

25    Counsel's objection apparently preserved the federal due process issue for direct appeal, as the

26    state court recognized that Kelsaw's claim presented a state law challenge as well as a federal

due process challenge.  *See People v. Kelsaw*, No. C047832, slip op. at 31.  It should additionally

be noted that, in this action, respondent did not assert an affirmative defense of procedural bar to

petitioner's due process claim based on the rap lyrics.  Accordingly, it appears that trial counsel's

objection adequately preserved the issue.  On this record, trial counsel's performance was not

deficient, and petitioner did not suffer prejudice.  *See Strickland*, 466 U.S. at 687-88, 694.

　　　　　　　　2.　　　　Exclusion of Gang Evidence

　　　　　　　　Kelsaw contends that the trial court violated his right to due process when it

excluded evidence of possible gang motivation for Cordero's murder (petition ground 5).

According to Kelsaw, this evidence would have tended to exculpate him since he was not a

member of any gang.  On direct appeal, the California Court of Appeal, Third District,

summarized the circumstances relating to this claim:

> Several pieces of evidence linked a person named Brandon
> Coleman to the murder of Cordero. Lawyer picked him out of a
> lineup, with 70 percent certainty, as one of the men at the scene in
> the Costco parking lot, even though Lawyer still maintained that
> [Kelsaw] did the actual shooting. A shoe seized from Coleman's
> brother matched the size (10 and a half) and description of one of
> the impressions in the mud at Costco. And Coleman "made himself
> scarce" after the killing. Coleman is a member of the Crips street
> gang, while Cordero was a member of a Bloods subset.
>
> At the time of his death, Cordero had a pending charge against him
> related to a drive-by shooting against some Crips. He usually
> carried a handgun. Although it was not in his written offer of proof,
> [Kelsaw], in the hearing, discussed evidence that there had been a
> drive-by shooting at a Denny's where people had gathered in
> connection with Cordero's funeral. [Kelsaw] also suggested that
> the manner in which Cordero was killed, execution-style, was
> indicative of gang warfare.
>
> The trial court expressed its opinion that the link between the gang
> activity described by [Kelsaw] and the death of Cordero was
> insubstantial. The court opined that, in this context, gang evidence
> is "highly prejudicial." Although the trial court did not explain this
> comment and [Kelsaw], on appeal, complains that we should not
> be concerned with prejudice to the victim, it is more likely the
> court used the term prejudice in the sense that it would inflame
> passions and become an obstacle to the jury's rational evaluation of
> the facts.

1  (*People v. Kelsaw*, No. C047832, slip op. at 25-26.)  The state court went on to reject Kelsaw's

2  claim:

> Admission of evidence is subject to the sound discretion of the trial court. (*People v. Robinson* (2005) 37 Cal.4th 592, 626.) "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.... [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v.. Hall* (1986) 41 Cal.3d 826, 833.)
>
> Here, [Kelsaw] attempted to use third-party culpability evidence not so much to link Coleman to the crime as to unlink [Kelsaw] from the crime. To do so, it was not enough to show Coleman was there. [Kelsaw] needed to show that Coleman's motive for being there made it doubtful [Kelsaw] was involved, in order to raise a reasonable doubt about [Kelsaw]'s guilt.
>
> Even assuming the defense could show Coleman was a Crip and Cordero was a Blood, there is no link between them other than presence at the murder that would suggest Coleman had a gang-related purpose to kill Cordero. Furthermore, the main evidence connecting Coleman to the crime-Lawyer's identification of Coleman as one of the perpetrators-was the same evidence, for the most part, that connected [Kelsaw] to the crime. There is no reasonable probability the jury would accept Lawyer's identification of Coleman but not [Kelsaw] as a perpetrator. Therefore, positing Cordero's killing as gang-related retaliation had no support in the evidence. As it was, the jury was apprised of the fact that Cordero was a gang member who was usually armed.
>
> Even if there was an identifiable inference to be made that Cordero's killing was gang-related, the trial court did not abuse its discretion in excluding the third-party culpability evidence pursuant to Evidence Code section 352. "'[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid.Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid.Code,] § 352).' [Citation.] A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion. [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 372-373, fn. omitted .)

1    As noted, the probative value of the proffered third-party
     culpability evidence was slight when considered in context.
2    Furthermore, the consumption of time to present all of the gang
     evidence and attempt to connect gang activities to the killing of
3    Cordero and the confusion that attempt would have engendered in
     the minds of the jurors justified the trial court's decision to exclude
4    the evidence.

5    Finally, [Kelsaw] claims the exclusion of third-party culpabiity
     evidence violated his federal due process rights.  There is no basis
6    for this claim.  "There was no error under state law, and [the
     California Supreme Court has] long observed that '[a]s a general
7    matter, the ordinary rules of evidence do not impermissibly
     infringe on the accused's [state or federal constitutional] right to
8    present a defense.' [Citations.]" (*People v. Robinson*, *supra*, 37
     Cal.4th at pp. 626-627.)

9

10   (*People v. Kelsaw*, No. C047832, slip op. at 26-27.)

11          Criminal defendants have a fundamental due process right, implicit in the Sixth

12   Amendment, to present a complete defense.  *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see*

13   *also Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  But that right is not unlimited.  *Greene v.*

14   *Lambert*, 288 F.3d 1081, 1090 (9th Cir. 2002).  A state law justification for exclusion of

15   evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary

16   or disproportionate" and "infringe[s] upon a weighty interest of the accused."  *United States v.*

17   *Scheffer*, 523 U.S. 303, 308 (1998); *Crane*, 476 U.S. at 689-91 (discussing the tension between

18   the discretion of state courts to exclude evidence at trial and the federal constitutional right to

19   "present a complete defense").  Consistent with due process, a court may exclude evidence that

20   "poses an undue risk of 'harassment, prejudice [or] confusion of the issues."  *Crane*, 476 U.S. at

21   689-90.

22          Accordingly, a defendant's right to due process is not automatically violated

23   "whenever 'critical evidence' favorable to him is excluded..."  *Montana v. Egelhoff*, 518 U.S. 37,

24   53 (1996).  Rather the exclusion of evidence must have rendered the trial fundamentally unfair.

25   *Clark v. Arizona*, 548 U.S. 735, 770-71.  Significantly, evidence tending to show that a third

26   party committed the offense may be constitutionally excluded when such evidence "is

                                                42

1   speculative or remote, or does not tend to prove or disprove a material fact in issue at the

2   defendant's trial." *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006). But such evidence may

3   not be constitutionally excluded merely because the prosecution has a strong case against the

4   defendant. *Id*. at 329-30. In a federal habeas proceeding, relief is warranted only if the

5   constitutional violation actually has a "substantial and injurious effect" upon the jury's verdict.

6   *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 121-122

7   (2007) (requiring *Brecht* review regardless of whether the state court recognized the error and

8   reviewed it for harmlessness).

9            In this case, the state appellate court reasonably concluded that no due process

10   violation resulted from the trial court's exclusion of evidence that the murder was motivated by

11   gang rivalry. The excluded evidence was speculative, and its probative value slight, at best.

12   Importantly, Kelsaw was not precluded from presenting evidence tending to suggest that

13   Coleman or anyone else was the actual shooter. (RT at 192-93.) The trial court expressly

14   allowed Kelsaw to "bring forth evidence who else was there, whatever testimony you have that

15   indicates that X did the killing rather than your client, those types of things are still allowed."

16   (RT at 193.) The court also expressly allowed "argument that someone else did it based on the

17   evidence you have presented." (RT at 193.) The court only prohibited Kelsaw from presenting

18   speculative evidence tending to show that the murder was gang-motivated, including Coleman's

19   possible membership in a hostile gang. (RT at 192-93.) As the court explained, "People can be

20   murdered for other reasons even though they're gang members... but I still haven't heard what the

21   factual or circumstantial link is to actually doing the crime." (RT at 191.)

22            In accordance with the trial court's ruling, the defense elicited testimony that

23   Lawyer had identified Brandon Coleman and his brother Lyle Coleman as two of three men who

24   had helped Kelsaw commit the murder. (RT at 1189, 1269-71, 2670-71, 2677-78.) Lawyer

25   described these men as "vicious," and further testified that they had traveled from Stockton to

26   Sacramento at Kelsaw's request, and had brought with them large "B[i]n Laden" type guns, as

43

best she could describe them.  (RT 1341-43, 1407.)  A pair of shoes belonging to one of the

Coleman brothers could not be eliminated as the source of one set of footprints near the murder

scene.  (RT at 1069, 2228-39.)  The defense also elicited Laywer's admission that Kelsaw "is not

gang affiliated."  (RT at 1238, 1391.)  The jury did hear, however, that the victim Cordero was a

gang member who "claimed red."  (RT at 1108, 1260-61, 1352.)  Defense counsel pointed out

"there's been evidence that the victim in this case, MiAngelo Cordero, was a gun toting, drug

dealing, gang banger" (RT at 2920), and argued that the prosecution "has got to prove the

disconnection [between the murder and possible gang motivation]... Isn't this a gang banging

case about territorial rights and imperatives and dope?  Sure looked like it."  (RT at 2995.)

Under these circumstances, the narrow exclusion of speculative evidence that the

victim's murder was motivated by gang rivalry did not render Kelsaw's trial fundamentally

unfair.  Moreover, by the same logic, any conceivable error did not have a "substantial and

injurious effect" on the jury's verdict.  *See Brecht*, 507 U.S. at 622.

E.    Other Allegations of Ineffective Assistance of Counsel

Kelsaw presents several additional specific allegations of deficient performance

by trial and appellate counsel.  Kelsaw contends that (1) trial counsel erred when he stated in his

opening statement that the muddy shoe prints found near the victim's body would be exculpatory

(petition ground 4); (2) trial counsel erred when he refused to re-call witness Kendra Ford to the

stand to impeach her earlier testimony (petition ground 13), and appellate counsel failed to raise

this issue on appeal (petition ground 12); (3) trial counsel made no attempt to contact a potential

eyewitness (petition ground 17), and appellate counsel failed to raise this issue on appeal

(petition ground 17); (4) appellate counsel failed to raise on appeal a claim that the Sacramento

County jail recorded privileged telephone conversations between Kelsaw and his trial attorney

(petition ground 11); (5) appellate counsel failed to raise on appeal a claim that the prosecutor

should have recused herself after attempting to obtain false testimony (petition ground 14); and

(6) appellate counsel failed to raise a claim challenging Lawyer's testimony in light of her

1    invocation of the 5th Amendment as to evidence of previous prostitution activity.

2              1.      Shoe Print Evidence

3              Before trial, defense counsel was informed that the analysis of shoe print

4    impressions found near the victim's body were not yet completed.  Defense counsel expressed a

5    desire to go ahead with the trial.  During his opening statement, defense counsel put red acrylic

6    paint on the bottom of a shoe and made an impression of the shoe, showing the jury the pattern

7    on the bottom of the shoe.  Counsel apparently displayed the shoe impression he made along with

8    one in a photo from the crime, which included a scale showing sizes.  Counsel stated:

9              The point being the evidence will show that the shoe out there is
               basically a size ten and a half.  What's important about that?  Mr.
10             Kelsaw doesn't wear a size ten.  Mr. Kelsaw, as well as being
               short, has little feet...  So the problem here is [the] shoes don't fit.
11

12   (Augmented RT at 216.)

13             The California Court of Appeal, Third District, summarized additional

14   background facts relative to this claim:

15             Two days after defense counsel gave his opening statement, the
               expert, Bruce Moran, issued his report concluding that the shoe
16             that left the impression was approximately size seven and a half.
               Based on the report and its timing, [Kelsaw] moved to dismiss or
17             to have the report excluded. The trial court found no discovery
               violation on the prosecution's part but offered [Kelsaw] a
18             continuance to prepare for Moran's testimony. Defense counsel
               said he did not need more time. The court denied [Kelsaw]'s
19             motion for dismissal or exclusion of the evidence. In closing
               argument, the prosecutor reminded the jury that defense counsel
20             had said the evidence would show the shoe impression was size 10.

21   (*People v. Kelsaw*, No. C047832, slip op. at 22.)

22             Kelsaw argues that trial counsel was ineffective for asserting in his opening

23   statement that the muddy shoe print would not "fit" when counsel knew that the prosecution's

24   expert had not finished analyzing the evidence and the evidence subsequently turned out to the

25   contrary (petition ground 4).  On direct appeal, the state court found that trial counsel's error

26   constituted deficient performance:

                                              45

> Here, the discussion of shoe size in the opening statement and the inability to present evidence consistent with the opening statement constituted deficient performance because better investigation and preparation could have avoided this predicament. Even just waiting until later, after the investigation was completed, to apprise the jury of the evidence would have sufficed.

(*People v. Kelsaw*, No. C047832, slip op. at 22.)  Nevertheless, the state appellate court rejected Kelsaw's ineffective assistance of counsel claim, reasoning that he had not suffered actual prejudice from the deficient performance:

> Nonetheless, the deficient performance was not prejudicial to [Kelsaw]. There was more than one shoe impression in the mud, and one of them was much larger than [Kelsaw]'s shoe size. The evidence concerning the size of the shoe impression referred to by defense counsel in the opening statement was the same as it would have been regardless of what defense counsel said about it during the opening statement. Furthermore, the size of the shoe impression, while it could have eliminated [Kelsaw] if it had been much larger than [Kelsaw]'s shoe size, was not particularly damning because a multitude of people could have left the same size print. In other words, it is not reasonably probable defense counsel's statement was prejudicial. (See *Strickland v. Washington, supra,* 466 U.S. at p. 694.)

(*People v. Kelsaw*, No. C047832, slip op. at 24.)

Even though defense counsel's error allowed the prosecutor to draw attention in closing argument to the defense's failure to deliver on an evidentiary promise, the state court's finding of no prejudice was reasonable.  The shoe print was not exculpatory in the manner represented by defense counsel at the start of trial, but neither was it particularly inculpatory.  Moreover, defense counsel's error did not cause the shoe print evidence to come out in a more damaging manner than it would have anyway.  Simply put, the state of the evidence was that one of the shoe prints of particular interest might or might not have been Kelsaw's.  Considered in context of the whole trial, the shoe print was a relatively insignificant piece of evidence in the prosecution's case against Kelsaw.  It is highly unlikely that the shoe print was a determining factor for the jury as to his guilt.

/////

46

1          Under these circumstances, Kelsaw fails to demonstrate that he suffered prejudice

2  from trial counsel's error. *Strickland v. Washington*, 466 U.S. at 93-94. Accordingly, the state

3  court's rejection of this claim was not contrary to, or an unreasonable application of clearly

4  established Supreme Court precedent, nor based on an unreasonable determination of the facts.

5                2.       Witness Kendra Ford

6          Kelsaw claims that trial counsel "refused to grant petitioner his [S]ixth

7  [A]mentment right to confrontation, by refusing to recall prosecution's rebuttal witness Kendra

8  Ford" to impeach her prior testimony (petition ground 12).

9          At trial, the defense's strategy was to show that Kelsaw was at a motel in Oakland

10  on the night of the murder in a room that he rented "off the books" from Kendra Ford. Kelsaw's

11  girlfriend, Latoya Horne, testified that she picked Kelsaw up in Oakland at 11:30 a.m. the

12  morning after the murder. Horne reported that Kelsaw had told her that he spent the previous

13  night at the Comfort Inn in Oakland with Sophonia Jean, the mother of his child. Horne also

14  claimed that she spoke to Kendra Ford, who worked with Jean at the Comfort Inn, on the

15  telephone. Horne testified that she asked Ford if Ford could come testify "that if she

16  remembered hooking up that room, could she do that, and [Ford] stated, yes." (RT at 2684,

17  2700-02.)

18          Ford testified for the prosecution in rebuttal. She acknowledged working at the

19  Comfort Inn with Jean, although Jean did not work there in 2002. Ford testified that she

20  recognized Kelsaw from seeing him at the Comfort Inn on previous occasions. Ford denied

21  having ever given Kelsaw a room for free. Ford testified that there was no way to give a room

22  key without entering the employee's code and the room number, and that such information was

23  stored in a computer. Ford also testified that she had spoken to Horne on the telephone once, and

24  that Horne said "she needed... help, [Kelsaw] was being framed for a murder that he didn't do,

25  and that she needed me to say that he was there and money was not an issue." (RT at 2778, 80-

26  82.)

1          In response to this rebuttal, the defense recalled Horne to the stand.  Horne

2    brought with her an undated tape recording of a conversation between two unidentified women.

3    Horne claimed that she had received this recording from Jean and that she had recognized the

4    two voices on the recording as belonging to Jean and Ford.  Horne said she recognized Ford's

5    voice from their two earlier phone conversations.  The tape recording was played for the jury and

6    a transcript was provided.  The transcript is attached to the petition as an exhibit.  In relevant

7    part, it reads:

8               Voice 2: Yeah, yeah, I hooked up the room, but I (unintelligible).

9               Voice 1:  But why you can't tell them that?  That's like fucking us
               up, cuz you won't go up there and tell them 'Yeah I hooked it up
10              and I don't remember when.

11              Voice 2: Shit, I don't remember the day, (unintelligible) remember
               the day, on another day when Salena (unintelligible) that shit.  I
12              think that be my ass.  I am gonna lose my job.  They already took
               me off the front desk, I don't wanna be involved.... [*sic* all]

13

14   (Petition, Exhibits at 199-200.)  Defense counsel did not recall Ford to the stand to impeach her

15   earlier testimony with the substance of this recording.

16          In order to demonstrate prejudice as required by *Strickland*, 466 U.S. at 93-94, a

17   petitioner asserting that his trial counsel acted ineffectively by failing to call a witness must show

18   what testimony the witness would have given and how it would have changed the outcome at

19   trial.  *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987).  The petitioner must provide

20   an affidavit or sworn statement from the witness or witnesses, showing how they would have

21   testified at trial.  *See Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (holding that petitioner

22   could not establish prejudice under *Strickland* where he failed to provide affidavit from alleged

23   witness).  Trial counsel's decision on whether or how to best impeach a witness is generally

24   deemed a strategic one, shielded by the *Strickland* presumption that counsel acted reasonably.

25   *United States v. Lindsay*, 157 F.3d 532, 535-36 (7th Cir. 1998), *but see Reynoso v. Giurbino*, 462

26   F.3d 1099, 1114 (9th Cir. 2006) (failure to impeach crucial witnesses constituted ineffective

48

1    assistance of counsel).

2            In this case, Kelsaw has failed to demonstrate ineffective assistance of counsel

3    because, as the superior court concluded on state habeas corpus review, there is no evidence

4    regarding what Ford would have testified to had she been recalled by the defense and impeached

5    with the substance of the undated recorded conversation.  Kelsaw offers no statement or

6    declaration from Ford nor any other evidence to corroborate Horne's assertion that the voice on

7    the tape belonged to Ford.

8            Even assuming, that it *was* Ford on the tape and that Ford would have admitted

9    the contents of the recording had she been recalled, Kelsaw has still not shown a reasonable

10   probability of a different verdict at trial.  Importantly, the unidentified woman on the tape

11   appeared to indicate that she did not remember when she "hooked up" a room.  Given the other

12   incriminating evidence against Kelsaw, the jury might have simply concluded that he was

13   "hooked up" sometime other than the night in question.  Kelsaw has failed to meet his burden of

14   demonstrating how Ford would have testified, if she had been recalled, and how the outcome of

15   the trial would have been affected.  Under these circumstances, the state court's rejection of this

16   claim was not contrary to, or an unreasonable application of the *Strickland* standard for

17   ineffective assistance of counsel, nor based on an unreasonable determination of the facts.

18           Kelsaw further asserts within the same ground that appellate counsel was

19   ineffective for failing to raise this issue on appeal.  Because the underlying claim was without

20   merit, however, appellate counsel cannot be found ineffective for failing to raise the claim on

21   appeal.  *See Miller*, 882 F.2d at 1434 (counsel has no obligation to raise meritless or weak

22   arguments on appeal).

23           3.      Alleged Failure to Call or Identify Potential Eyewitness

24           Kelsaw contends that trial counsel was ineffective for failing to locate an

25   unidentified potential eyewitness (petition ground 17).

26           At trial, the defense called Leah Lucchetti to the stand.  Lucchetti testified that she

49

1   was employed in "a non-sworn" capacity as a "community service officer" for the Sacramento

2   Police Department.  Her duties included "tak[ing] reports [of] burglaries, traffic accident,

3   anything where the suspect is not on the scene anymore."  Luccheti testified that she was present

4   at the Costco crime scene on the afternoon following the shooting, when an unidentified person

5   approached her.  Because of her limited "capacity at homicide scenes," Luccheti referred that

6   person to a detective.  Lucchetti did not write a report about her contact with this unidentified

7   individual.  (RT at 2557-59.)

8          Kelsaw alleges that the unidentified witness "had seen a car leaving the crime

9   scene at a high rate of speed."  Kelsaw presents no evidentiary support for this allegation.

10  Kelsaw cites to Luccheti's testimony at trial, however the cited pages of the transcript do not

11  support this assertion.  Rather, Luccheti did not give any additional details about her contact with

12  this individual, and Kelsaw has pointed to no other evidence that the unidentified witness

13  reported seeing a car leave the crime scene.

14         On state habeas corpus review, the Sacramento County Superior Court rejected

15  Kelsaw's claim of ineffective assistance of counsel, reasoning "Petitioner does not identify the

16  witness or present the evidence that the witness could have provided...  Therefore, he has not

17  shown that counsel's conduct was deficient."  (*In re Kelsaw*, No. 07F08740, slip op. at 3).  This

18  decision is not contrary to, or an unreasonable application of the *Strickland* standard for

19  ineffective assistance of counsel.

20         When a petitioner asserts that his trial counsel acted ineffectively by failing to call

21  a witness, he must, at a minimum, identify the witness.  *See United States v. Murray*, 751 F.2d

22  1528, 1535 (9th Cir. 1985).  Kelsaw has not done so, nor submitted a declaration or sworn

23  statement demonstrating what the excluded witness would have testified if called at trial.  *Dows*,

24  211 F.3d at 486.  Kelsaw's unsupported allegations about what the witness would have testified

25  to are insufficient.  Kelsaw is not entitled to relief for counsel's alleged failure to call an

26  unidentified witness at trial.

The state court addressed Kelsaw's contention that counsel failed to secure the testimony of the witness, however, the claim presented here could additionally be interpreted as an attack on counsel's alleged failure to conduct sufficient investigation in order to locate or identify this potential witness.  "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 690-90).  At the same time, "counsel need not interview every possible witness to have performed proficiently."  *Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003).

Here, Kelsaw alleges that he requested his trial attorney to locate and interview this witness prior to trial, but states that counsel "made no attempts at doing so."  Without more, this aspect of Kelsaw's claim must also fail because it is based only on speculation.  Nothing supports Kelsaw's conclusory allegation that the unidentified witness would have testified favorably at trial.  *Morris v. State of Cal.*, 966 F.2d 448, 455 (9th Cir. 1991) (conclusory allegations and speculation insufficient to support a claim of ineffective assistance of counsel or to require further development at an evidentiary hearing).  In the absence of demonstrated prejudice, this aspect of Kelsaw's claim also fails.

Kelsaw further asserts within the same ground for relief that appellate counsel rendered ineffective assistance in failing to raise this issue on appeal.  Once again, however, nothing in the trial record demonstrates that trial counsel provided ineffective assistance in failing to identify or locate this potential witness or in failing to present the unidentified witness's testimony at trial.  Because Kelsaw's underlying claim about trial counsel's performance is without merit, his claim that appellate counsel failed to raise the issue on appeal likewise fails.  *See Miller*, 882 F.2d at 1434.

4.     Recorded Jail Calls

Kelsaw contends that appellate counsel deficiently failed to contend on appeal that the prosecutor committed misconduct in relation to the recording of privileged telephone

1    conversations between Kelsaw and his trial attorney (petition ground 11).

2           As part of his new trial motion, petitioner offered several documents revealing

3    that the Sacramento County Jail had recorded "two hours" worth of conversations between

4    Kelsaw and his attorney.  (CT at 1139-45.)  According to those documents, a sealed copy of a

5    tape recording had been forwarded to the trial prosecutor.  The tape had was labeled with

6    Kelsaw's name, dated, and had a paper insert with the description "Attourney [*sic*]

7    call?...Coaching Witness?...check, talking about case...both sides."  (CT at 1144.)  The

8    prosecutor then produced the recording, still sealed, to Kelsaw's trial counsel, expressly

9    indicating that neither she nor her investigator had listened to the tape, as evidenced by its

10   unbroken seal, and that she had directed jail staff to stop recording inmates' telephone calls to

11   their attorneys.  (CT at 1143.)

12          Trial counsel subsequently requested an accounting of all recorded telephone calls

13   by the jail involving Kelsaw in order to investigate "any allegation of prosecutorial

14   misconduct..."  (CT at 1145, 1212-25.)  In a post trial hearing on the issue, Sergeant Brian

15   Banning, supervisor in charge of the classification and intelligence unit of the main jail, testified

16   that their computer system did not maintain such records.  (RT at 2192-213.)  This testimony was

17   consistent with information previously discovered by the prosecution to the defense indicating

18   that the jail does not maintain a "master log" of recorded telephone calls.  Instead, once a

19   recording is made, "the tape is placed in an out box..."  (CT at 1225.)

20          The trial court denied Kelsaw's new trial motion, reasoning that any jail recording

21   provided to the prosecution had already been discovered to the defense and that the prosecution

22   did not engage in any "improper monitoring" of the contents of Kelsaw's privileged phone calls.

23   (RT at 3220-21.)  The court explained its reasoning:

24          I'm satisfied that anything that was captured in that sort of form or
            format that was given to the district attorney's office was, in fact,
25          discovered.  And that's based upon listening through the course of
            the trial and based upon in the trial itself, there really was no
26          information during the course of the trial that was developed after

52

Mr. Kelsaw was in custody. [¶] That information that was all produced was based on witnesses and information gathered prior to the arrest, at least it appears to me at first blush. So there doesn't appear to be this devious link. [¶]... [¶]...[T]he real bottom line issue here is whether or not there is any prosecutorial misconduct and whether or not the prosecutor has had that particular information and not given it over. [¶] And again, it just does -- at this particular juncture, this information that's out there, it -- if, in fact, it is out there -- based upon the totality and the circumstances and what I understand and what I have seen during the course of trial, it's just a couple things -- it just isn't sufficient information before the Court to continue this matter for further inquiry. It just doesn't appear to be fruitful. [¶] And additionally, as I indicated before, it just [does] not appear to the Court that information was developed during the course of the trial that indicates that it was discovered by improper monitoring, and the Court is satisfied that all captured information was, in fact, turned over.

(RT at 3220-21.)

On state habeas corpus review, the Sacramento County Superior Court held, with respect to this claim:

[Kelsaw] argues that jail staff improperly recorded conversations between [Kelsaw] and his trial counsel. A tape of one privileged conversation came into the possession of the prosecutor. [Kelsaw] has not shown that the privileged information was used in any way. To the contrary, the attached documents show that neither the prosecutor nor the prosecutor's investigator listened to the tape; instead, it was forwarded in a sealed container to [Kelsaw]'s trial attorney. Therefore, there was no basis for raising any claim on appeal.

(*In re Kelsaw*, No. 07F08740, slip op. at 4.)

As previously set forth, appellate counsel is ineffective for failing to raise a claim on appeal only if its omission was objectively unreasonable and its inclusion would have, to a reasonable likelihood, led to a different result." *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Barnes*, 463 U.S. at 751. Importantly, this court is bound by the state court's factual finding that the prosecutor did not listen to the contents of the privileged tape. 28 U.S.C. §2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (on federal habeas corpus, state court factual findings are "presumed correct absent clear and convincing evidence to the contrary). Thus, in this regard, no misconduct occurred. *See generally Weatherford v. Bursey*, 429 U.S.

53

545, 556-58 (1977) (finding no constitutional violation where government agent intercepted confidential information and information was *not* communicated to prosecutor).  Appellate counsel had no duty to raise the issue on appeal.  *See Miller*, 882 F.2d at 1434.

Kelsaw alternatively asserts that the prosecution failed to disclose the tape recording to the defense in a timely manner.  In *Brady v. Maryland*, the United States Supreme Court held that the suppression before trial of requested evidence that is favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. 83 (1963).  Here, Kelsaw undisputably received the tape recording at issue, but complains that it was made on April 6, 2004 and not provided to the defense until over a month later, on May 11, 2004.

Respondent disputes Kelsaw's assertion that the recording was made on April 6, 2004.  The tape was labeled "(04/06/04 1634 (Wed)." (CT at 1144.)  In 2004, April 6 fell on a Tuesday, not a Wednesday.  According to documentation submitted by the defense, the prosecutor received the tape on May 6, 2004. (CT at 1141, 1143-44.)  The prosecutor notified defense counsel about the recording the same day she received it (CT at 1141, 1143), and then left the recording for counsel to pick up the next day, on May 7, 2004 (CT 1144).  Defense counsel listened to the recording four days later, on May 11, 2004.  (CT at 1214.)  Thus, regardless of when the tape was made, it is undisputed that the prosecutor produced the recoding to the defense the day after she personally received it.  It is further notable that defense counsel never suggested to the trial court during argument on this matter that there had been any undue delay in receiving the evidence.  (RT at 3181-321.)

Even assuming, however, that the prosecutor possessed the sealed tape recording for a month before providing it to the defense, Kelsaw fails to demonstrate that appellate counsel had a valid *Brady* claim to raise on appeal.  Kelsaw cites no controlling authority, and a search reveals none, demonstrating that the rule of *Brady* was violated when the defense allegedly experienced a one month delay in receiving the tape.

1    In sum, based on the state court's factual finding that no misconduct occurred,

2   appellate counsel was not ineffective for declining to raise this issue on appeal.  Petitioner's

3   additional allegations of delay do not affect the reasonableness of the state court's conclusion in

4   this regard.  The superior court's rejection of petitioner's ineffective assistance of counsel claim

5   based on the tape recording is not contrary to, or an unreasonable application of clearly

6   established Supreme Court precedent.

7    5.    Prosecutorial Recusal

8    Petitioner claims that trial counsel was ineffective for failing to seek the recusal of

9   the Sacramento County District Attorney's Office for allegedly attempting to elicit "false

10   evidence" from a prospective witness (petition ground 14).

11    Kelsaw and Lawyer had a joint preliminary hearing.  At the preliminary hearing,

12   the prosecution called Jeanine Henderson, who testified that she had heard "muffled gunshots" in

13   the background while on the telephone phone with Lawyer at the time of the murder.

14    Prior to Kelsaw's trial, defense counsel filed a motion to dismiss, or, in the

15   alternative, a motion to preclude Henderson's anticipated testimony regarding the contents of the

16   alleged telephone call between Lawyer and Henderson on the night of the murder.  (CT at 325-

17   46.)  Counsel argued that recently produced telephone records demonstrated that Henderson's

18   preliminary examination testimony in this regard was false.  Counsel asserted in a separate

19   written motion for dismissal and/or sanctions that the prosecution had failed to timely discover

20   these telephone records prior to the preliminary hearing.  (CT at 314-24.)

21    At a pre-trial hearing on this motion, trial counsel argued vigorously in support of

22   dismissal.  (RT at 10-15.)  Counsel accused the prosecutor of "subrogation, of perjury,

23   obstruction of justice and conspiracy to violate my client's rights."  (RT at 10.)  Counsel briefly

24   noted, as a possible alternative to dismissal, that he would ask for a continuance of at least 15

25   days to file a recusal motion.  (RT at 14.)  The trial court responded that possible recusal was "an

26   issue for a different time."  (RT at 15.)

1    The trial court subsequently denied Kelsaw's motion to dismiss in a written

2    decision dated January 29, 2004.  (CT at 461-63.)  The court indicated that Henderson's

3    testimony at the preliminary hearing was "vague as to specifics[,] at best.  It is not unequivocal.

4    Her testimony is not necessarily factually inconsistent with her interview and the cell phone

5    records...  It cannot be held as a matter of law for the purpose of this motion that she gave

6    perjured testimony."  (CT at 462.)  The court also found that the telephone records had been

7    timely produced.  The court expressly declined to find that the prosecution had "engaged in a

8    pattern of stonewalling discovery" and "fomented evidence."  (CT at 463.)

9    At the next court appearance, which was also on January 29, 2004, defense

10    counsel stated that he had recently spoken to Teressa Anderson, another potential witness for the

11    prosecution.  According to counsel, Anderson reported that she had been told by the prosecutor "I

12    may need you to testify that you were with [Kelsaw] on the night of the murder."[3]  (RT at 20.)

13    Counsel asserted that this alleged statement by the prosecutor to Anderson was "part of a pattern

14    of suggestion, and tampering with witnesses..."  (RT at 20.)  Counsel nevertheless insisted,

15    "We're prepared to proceed and we're not going to recuse."  (RT at 21.)

16    The prosecutor adamantly denied counsel's accusations.  She expressly denied

17    making the statement that Anderson had attributed to her, and she further asserted "any

18    indication by [Anderson] to the contrary is untrue."  (RT at 21-22.)  After listening to the

19    prosecutor's response, the trial court reaffirmed its ruling that the prosecution had not engaged in

20    any "transgression" warranting dismissal or any lesser sanctions.  (RT at 22.)

21    Ultimately, defense counsel did not seek recusal of the prosecutor or her office.

22    Petitioner claims that this constituted ineffective assistance of counsel on the part of his attorney.

23    Petitioner presented this claim on state habeas corpus review to the Sacramento County Superior

24    Court.  The state court rejected the claim, concluding simply that "[Kelsaw] has not shown that

25

26    _____

     [3] Neither the prosecution nor the defense called Anderson to testify at Kelsaw's trial.

1  moving to recuse the District Attorney's office would have made any difference in the case.  If

2  granted, the motion would have resulted in [Kelsaw]'s case being prosecuted by another agency,

3  most likely the Office of the Attorney General."  (*In re Kelsaw*, No. 07F08740, slip op. at 2.)

4  　　　　In order to succeed under the *Strickland* standard for ineffective assistance of

5  counsel, Kelsaw must demonstrate that the omitted motion would have been meritorious and a

6  reasonable probability that the verdict would have been different had the motion been pursued.

7  *See Strickland*, 466 U.S. at 486, 494.  Here, there is no indication that a recusal motion would

8  have been successful.  As previously set forth, the trial court explicitly found no evidence to

9  support the defense's claim that the prosecutor had engaged in misconduct with respect to

10 prospective witness testimony.  In addition, foregoing the recusal motion allowed the defense to

11 challenge the case against petitioner in one additional manner: by attacking the strategy and

12 conduct of that particular prosecutor.  (*See, e.g.*, RT at 27 (claiming "they put on perjury... hid

13 items for six months... interview techniques are less than wonderful... I wanted instruction in

14 regard to discovery"); RT at 2969 (arguing that "the DA case" went "[d]own the drain, down the

15 tube, it is all a lie"); RT at 3015 (claiming prosecutor's investigator was "suggestive in the

16 identification").)  Perhaps counsel made a strategic choice in declining to pursue a recusal

17 motion.

18 　　　　In any event, petitioner also fails to demonstrate that he suffered prejudice.  It

19 appears that a recusal motion would have been without merit and unsuccessful.  Even if the

20 recusal motion had been meritorious, Kelsaw's case would still have been prosecuted, albeit by a

21 different state agency.  Nothing in the record indicates that prosecution by a different state

22 agency would have resulted in a different outcome.  Under these circumstances, the state court's

23 rejection of Kelsaw's claim that trial counsel deficiently failed to file a recusal motion is not

24 contrary to, or an unreasonable application of Supreme Court prejudice.

25 　　　　　　6.　　Lawyer's Invocation of the Fifth Amendment

26 　　　　Kelsaw contends that appellate counsel was ineffective for failing to raise on

57

1 appeal a claim that the trial court erroneously allowed Lawyer to continue to testify after she

2 invoked her Fifth Amendment right against self-incrimination (petition ground 18).

3       At trial, defense counsel sought to elicit details about Lawyer's 1999 prostitution

4 arrest.[4]  In a hearing held outside the presence of the jury, Lawyer was represented by her own

5 separately appointed counsel, Michael Bowman.  On Bowman's advice, Lawyer declined to

6 answer any questions concerning this incident "on the grounds that it may incriminate me on the

7 [F]ifth and 14th amendment." (RT at 1378-79.)  Afterwards, Lawyer's testimony before the jury

8 resumed.  As a result of her invocation, defense counsel did not ask Lawyer about her prior arrest

9 for prostitution in front of the jury.  (RT at 1378-80.)

10       Instead, defense counsel elicited testimony from San Francisco Police Officer

11 Maria Escobar Worden, who described the circumstances of Lawyer's arrest for prostitution.

12 (RT at 2560-63.)  Specifically, on January 12, 1999, Officer Warden conducted a traffic stop of a

13 vehicle in the Mission District of San Francisco.  The driver was a male wearing a blouse, a skirt,

14 pumps and a wig.  The sole passenger, later identified as Lawyer, provided a false name.  Lawyer

15 admitted to the officer that she was a prostitute and that she had agreed to receive oral sex from

16 the driver in exchange for money.  (RT at 2560-63.)

17       As to Kelsaw's claim that appellate counsel rendered ineffective assistance of

18 counsel in failing to raise this issue on appeal, the Sacramento County Superior Court held:

19     [Kelsaw] complains that Lawyer was allowed to invoke her right
    against self-incrimination as to a 1999 arrest, apparently for

20     prostitution.  According to the minute order for March 17, 2004,
    [Kelsaw]'s motion to be allowed to impeach Lawyer with the 1999

21     arrest was granted in part.  The opinion on appeal confirms that the
    arrest was used to impeach Lawyer's credibility.  Since there was

22     no other ground offered for admitting evidence of the prostitution
    arrested, appellate counsel had no basis for an appellate argument.

23

24 _____

25     [4] Apparently Lawyer had been arrested for prostitution but had not been charged.
Although the arrest was in 1999, it was noted that the statute of limitations was most likely tolled
by her arrest.  (RT at 1377-79.)  Lawyer's immunity agreement with the Sacramento County

26 District Attorney's Office did not extend to any acts of prostitution.  (Augmented CT at 1-8.)

1    (*In re Kelsaw*, No. 07F08740, slip op. at 5.)

2          Indeed, the record reflects that the defense successfully impeached Lawyer's

3    credibility with her prostitution arrest through the testimony of Officer Escobar.  In light of the

4    fact that the details of the prostitution arrest came in through this witness, no error appears on

5    which appellate counsel could have successfully pursued an appeal.

6          Even assuming that the trial court erred in allowing Lawyer to invoke the

7    privilege with respect to the prostitution arrest and then continue to testify on other matters, it is

8    apparent that such a claim of error would not have succeeded on appeal.  When cross-

9    examination for impeachment purposes has been improperly restricted, prejudicial effect depends

10   on a multitude of factors, including the importance of the witness's testimony to the

11   prosecution's case, whether the testimony was cumulative, the presence or absence of evidence

12   corroborating or contradicting the witness's testimony, the extent of cross-examination otherwise

13   permitted, and the overall strength of the prosecution's case.  *Delaware v. Van Arsdall*, 475 U.S.

14   673, 684 (1986); *see also United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir. 1984) (finding

15   no prejudice from government witness' invocation of Fifth Amendment where anticipated

16   testimony would have been cumulative to other evidence presented to the jury).  In this case,

17   Lawyer's anticipated testimony would have been brief and cumulative to that given by Officer

18   Escobar.  Although Lawyer was a key witness, the defense's cross-examination of her was not

19   limited in any other areas.  Under these circumstances, the state appellate court would have found

20   any such error harmless beyond a reasonable doubt.  *See Chapman v. California*, 386 U.S. 18

21   (1967) (state court not required to reverse a conviction on an error of constitutional magnitude if

22   that error was harmless beyond a reasonable doubt").  For the same reason, to any extent error

23   occurred, it failed to have a "substantial and injurious effect or influence in determining the

24   jury's verdict."  *See Brecht*, 507 U.S. at 637; *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (*Brecht's*

25   "substantial and injurious effect" standard applies on federal habeas corpus review).

26          In sum, it is not reasonably probable that the appellate court would have declined

1  to affirm Kelsaw's convictions if only appellate counsel had raised this particular claim. Kelsaw

2  fails to show deficient performance on the part of appellate counsel or that he suffered actual

3  prejudice. *See Strickland*, 466 U.S. 687, 694. The state court's rejection of this ineffective

4  assistance of counsel claim is not contrary to, or an unreasonable application of clearly

5  established Supreme Court precedent.

6          F.      Alleged Instructional Errors

7               1.      CALJIC No. 3.30

8          Kelsaw contends that the given instructions confused the jury about the required

9  mens rea for the kidnaping special circumstance to the murder count, in violation of his right to

10  due process (petition ground 8). Specifically, he contends that the court erred when it referenced

11  the kidnapping special circumstance within its giving of CALJIC No. 3.30, the instruction on

12  general criminal intent:

13          In the crime of kidnapping, Penal Code Section 207, the allegation
        of armed with a firearm, Penal Code Section 12022(a)(1), *and the*

14          *special circumstance*[ ] *of murder in the commission of*
        *kidnapping*[,] Penal Code Section 190.2(a)(17)(B), there must exist

15          a union or joint operation of act or conduct and *general criminal*
        *intent.* General criminal intent does not require an intent to violate

16          the law. When a person intentionally does that which the law
        declares to be a crime, he's acting with general criminal intent even

17          though he may not know that his act or conduct is unlawful.

18  (RT at 2842 (emphasis added).) The court also instructed the jury with CALJIC No. 8.80.1,

19  concerning the required intent to find true the special circumstances allegations:

20          Unless an intent to kill is an element of the special circumstances,
        If you find you are satisfied beyond a reasonable doubt that the

21          defendant actually killed a human being, you need not find that the
        defendant intended to kill in order to find the special circumstance

22          [murder in the commission of kidnapping] to be true.

23          If you find that a defendant was not the actual killer of a human, or
        if you're unable to decide whether the defendant was the actual

24          killer, [or an] aider and abettor, you cannot find the special
        circumstances to be true unless you are satisfied beyond a

25          reasonable doubt that such defendant, *with the intent to kill*, aided,
        abetted, counseled, commanded, induced, solicited, induced

26          requested [*sic*] or assisted any [actor] in the commission of the

murder in the first degree or with reckless indifference to human life[, and] as a major participant aided, abetted, counseled, commanded, induced, solicited, requested or assisted in the commission of the crime kidnapping which resulted in the death of a human being, namely Mi[']angelo Cordero.

(RT at 2848-49 (emphasis added).)

Petitioner argues that the given version of CALJIC No. 3.30 improperly identified the kidnaping special circumstance to the murder count as requiring only general criminal intent, whereas, in actuality, as set forth in CALJIC No. 8.80.1, if the jury found that Kelsaw was an aider and abettor as opposed to the actual killer, it could only find the special circumstance true if he had an intent to kill or if he acted with reckless indifference to human life.  On direct appeal, the California Court of Appeal, Third District, found with respect to this claim:

...CALJIC No. 3.30, read together with CALJIC No. 8.80.1, did not mislead the jury.  CALJIC No. 3.30 informed the jury that the kidnapping special circumstance does not require an intent to violate the law but does require an intentional act.  This is a true statement, even if it does not fully state the mens rea requirement. Applying CALJIC No. 8.80.1, however, the jury necessarily found the required mens rea for the kidnapping special circumstance.

 [Kelsaw] asserts that, because the jury instruction generically describing specific intent included a reference to the lying-in-wait special circumstance but not the kidnapping special circumstance, we should infer that the jury was confused and may have found the kidnapping special circumstance true without finding the requisite mens rea. The inference, however, is not a valid one because the jury was informed, specifically, about the mens rea of the kidnapping special circumstance by CALJIC No. 8.80.1. The way the court instructed with respect to the kidnapping special circumstance was appropriate because intent to kill or reckless disregard for human life was required only if the jury found [Kelsaw] only aided and abetted in the murder.

[Kelsaw] also asserts that the verdict forms further confused the jury because the lying-in-wait form asked whether [Kelsaw] "intentionally killed the victim while lying in wait ...," while the kidnapping special circumstance form did not have similar mens rea wording. Again, because the mens rea requirement for the kidnapping special circumstance finding differs based on whether [Kelsaw] killed Cordero himself or only aided and abetted the killing, it was appropriate not to include specific intent language in the verdict form. The jury was properly instructed.

1   (*People v. Kelsaw*, No. C047832, slip op. at 34-36.)

2      A claim of instructional error is cognizable on federal habeas corpus only if it "so

3   infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*,

4   502 U.S. at 72; *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Cupp v. Nauhten*, 414

5   U.S. 141, 146-47 (1973).  It is not enough to show that the instruction was "undesirable,

6   erroneous, or even universally condemned," but rather, it must have actually rendered the trial

7   fundamentally unfair.  *Estelle*, 502 U.S. at 72.  The challenged instruction or instructions "may

8   not be judged in artificial isolation, but must be considered in the context of the instructions as a

9   whole and the trial record." *Id.*  If the instructions, when considered in this manner, are found to

10  be ambiguous, then a due process violation results only if there is a reasonable likelihood that the

11  jury misapplied the challenged instruction in a manner that violates the Constitution.  *Id.* (citing

12  *Boyde v. California*, 494 U.S. 370, 380 (1990)); *see also Middleton v. McNeil*, 541 U.S. 433, 437

13  (2004) (applying same standard to uphold erroneous instruction).  In addition, on federal habeas

14  corpus review, no relief can be granted without a showing that the instructional error had a

15  "substantial and injurious effect of influence in determining the jury's verdict." *Calderon v.*

16  *Coleman*, 525 U.S. 141, 146-47 (1998); *Brecht*, 507 U.S. at 637.

17     In this case, the challenged instruction was not inaccurate or erroneous; at worst, it

18  was potentially misleading if considered on its own and not in conjunction with the other

19  instructions.  The given version of CALJIC 3.30 accurately informed the jury that a finding of

20  general intent was necessary (although, as Kelsaw posits, not sufficient) for a true finding on the

21  kidnaping special circumstance to the murder count.  The given version of CALJIC 8.80.1, on the

22  other hand, clearly explained the additional mens rea required to satisfy the kidnaping special

23  circumstance.  As set forth in CALJIC No. 8.80.1, the jury need not find specific intent to kill as

24  an element of the kidnaping special circumstance if the jury already found, beyond a reasonable

25  doubt, that Kelsaw was the actual killer.  Otherwise, the jury could not find the special

26  circumstance true unless it found, beyond a reasonable doubt, that Kelsaw either [1] with the

intent to kill aided... any actor in the commission of a murder in the first degree, or [2] with reckless indifference to human life and as a major participant, aided... in the commission of the crime of kidnaping which resulted in the death of a human being...”

Kelsaw additionally complains that the given version of CALJIC No. 3.31, which generally describes specific intent, specifically included the murder special circumstance for lying in wait but did not mention that of kidnaping.  Similarly, he argues that the verdict forms for the two special circumstances were inconsistent because the lying in wait form asked whether Kelsaw “intentionally killed the victim while lying in wait...,” while the kidnaping special circumstance form did not ask a similar question.  As the state appellate court explained, these differences were appropriate because the mens rea requirement for the kidnaping special circumstance finding differs based on whether the jury found that Kelsaw actually killed Cordero or only aided and abetted the killing.

In sum, Kelsaw’s jury was properly instructed.  The challenged instruction was technically accurate, if not complete standing on its own, with respect to the mens rea requirement.  Considering the instructions as a whole, there appears no reasonable probability that the jury misapplied the challenged instruction in a manner that violates the Constitution.  *See Boyde*, 494 U.S. at 380.  Moreover, in light of this conclusion, petitioner also fails to show that the challenged instruction adversely affected the jury’s verdict.  *See Brecht*, 507 U.S. at 637.  The state court’s rejection of petitioner’s instructional error claim is not contrary to, or an unreasonable application of clearly established Supreme Court precedent.

2.    CALJIC No. 2.21.2

Kelsaw also claims that the trial court’s instruction concerning a witness’s willfully false testimony impermissibly reduced the prosecution’s burden of proof from “proof beyond a reasonable doubt” to “the probability of truth” in violation of his right to due process (petition ground 9).

At trial, Kelsaw’s jury was instructed with CALJIC No. 2.21.2 as follows:

63

1
2
3

> A witness who is willfully false in one material part of his or her testimony is to be distrusted in others.  You may reject the whole testimony of a witness who willfully had testified falsely as to a material point, unless, from all the evidence you believe the *probability of truth* favors his or her testimony in other particulars.

4   (RT at 2835.)  It is the "probability of truth" language above to which petitioner objects.

5   On direct appeal, the California Court of Appeal, Third District, rejected Kelsaw's

6   claim, stating simply that "[a]s [Kelsaw] acknowledges... the California Supreme Court has

7   rejected this assertion.  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 493.)"  (*People v. Kelsaw*,

8   No. C047832, slip op. at 36.)  According to the precedent cited by the state appellate court, it is

9   not reasonably probable that jurors would misunderstood the "probability of truth" reference in

10  CALJIC No. 2.21.2 to replace the prosecution's burden of proof beyond a reasonable doubt, in

11  light of all the other standard instructions provided to the jury.  *Hillhouse*, 27 Cal.4th at 493

12  (citing *People v. Riel*, 22 Cal.4th 1153, 1200 (2000)).

13  The Ninth Circuit has previously addressed and rejected a constitutional due

14  process challenge to CALJIC 2.21.2, although that challenge was premised on a different

15  argument.  *See Turner v. Calderon*, 281 F.3d 851, 856-66 (9th Cir. 2002) (declining to issue a

16  certificate of appealability on the habeas petitioner's claim that CALJIC No. 2.21.2 violated due

17  process).  In any event, Kelsaw's jury was completely and properly instructed on the reasonable

18  doubt burden of proof, and Kelsaw makes no contrary allegations.  Under these circumstances,

19  there is no reasonable probability that the jury convicted petitioner on only "the probability of

20  truth" as opposed to the correct standard of "proof beyond a reasonable doubt."  *See Boyde*, 494

21  U.S. at 380.  Thus, the state appellate court's rejection of Kelaw's claim regarding CALJIC No.

22  2.21.2 is not contrary to, or an unreasonable application of clearly established Supreme Court

23  precedent.  Kelsaw's claims of instructional error must be rejected.

24                                          VI.  CONCLUSION

25  For the foregoing reasons, IT IS HEREBY RECOMMENDED that the application

26  for writ of habeas corpus be DENIED.

1          These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

3    one days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6    shall be served and filed within seven days after service of the objections.  Failure to file

7    objections within the specified time may waive the right to appeal the District Court's order.

8    *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

9    1991).  In any objections he elects to file Kelsaw may address whether a certificate of

10   appealability should issue in the event he elects to file an appeal from the judgment in this case.

11   *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a

12   certificate of appealability when it enters a final order adverse to the applicant).

13    DATED: September 13, 2010

14                *Charlene H. Sorrentino*

15               CHARLENE H. SORRENTINO
                 UNITED STATES MAGISTRATE JUDGE